FORD MOTOR COMPANY, Appellant,

v.

Jorge AGUINIGA and Estehla Aguiniga, individually and as representatives of the Estates of Claudia Vanessa Aguiniga, deceased, Andrea Cristal Aguiniga, deceased, and Jorge Ricardo Aguiniga, deceased, and for and on behalf of all persons entitled to bring suit as a result of the wrongful death of Claudia Vanessa Aguiniga, deceased, Andrea Cristal Aguiniga, deceased, and Jorge Ricardo Aguiniga, deceased; Alfredo Plata, individually, Alejandro Plata, individually, Carlos Plata, individually, Jose Plata Flores, individually, Maria Esthela Aguiniga, as representative of the Estates of Enedina Flores Plata, deceased, and Desidiro Plata, deceased, and for and on behalf of all those entitled to bring suit as a result of the wrongful death of Enedina Flores Plata, deceased, and Desidiro Plata, deceased; Alfonso Ibarra Ponce, individually and as representative of the Estates of Dora Leticia Ponce, deceased, Rocio Ponce, deceased, Alfonso Ponce, deceased, and for and on behalf of all persons entitled to bring suit as a result of the wrongful death of Dora Leticia Ponce, deceased, Rocio Ponce, deceased, and Alfonso Ponce, deceased, Appellees.

No. 04–97–01018–CV.

Court of Appeals of Texas, San Antonio.

Nov. 3, 1999.

Craig A. Morgan, Jessie A. Amos, Brown McCarroll & Oaks Hartline, L.L.P., Austin, for Appellant.

William R. Edwards, III, John Blaise Gsanger, Edwards Law Firm, L.L.P., Corpus Christi, William R. Edwards, Edwards, Perry & Haas, L.L.P., Corpus Christi, Frank R. Nye, Jr., Law Offices of Frank R. Nye, Jr., Rio Grande City, Thomas H. Crofts, Jr., Ellen B. Mitchell, Crofts, Callaway & Jefferson, P.C., San Antonio, Wilton F. Chalker, Chalker, Bair, P.C., Houston, Tamara Tejml Cuthrell, Flower Mound, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LOPEZ, Justice, PAUL W. GREEN, Justice.

## OPINION

Opinion by: ALMA L. LOPEZ, Justice.

This is an appeal from a jury verdict finding appellant, Ford Motor Company (Ford), liable on strict liability claims of product defect and negligence. The jury subsequently awarded appellees a total of $16,000,000 in actual damages. On appeal, Ford raises the following: (1) there was no evidence that there was any defect or negligence by Ford; (2) the expert opinion was not founded on any reasonable scientific basis; (3) venue was improper in Starr County; (4) appellees failed to plead and prove standing to assert a claim on behalf of the decedents' estates; (5) the trial court erroneously applied the law of Texas; and (6) the trial court lacked subject matter jurisdiction over claims by Mexican nationals because no treaty exists between the U.S. and Mexico granting these nationals equal access to American courts. Because we find that Ford's issues are without merit, we affirm.

### Factual and Procedural Background

In February 1994, Jorge Aguiniga operated a car business in Houston. He purchased a 1991 Ford Aerostar van at an auction in Louisiana. At the auction, Aguiniga personally inspected the vehicle before purchasing it. In addition, the vehicle was inspected a second time by his mechanic in Houston. It was inspected a third time by a Texas-licensed vehicle inspector to have the van registered and licensed in Texas. Nothing out of the ordinary was discovered as a result of these inspections.

In July 1994, Jorge's wife, Estehla, embarked on a family vacation to San Antonio and Mexico with their children, Vanessa, Cristal, and Jorge, Jr. On July 18, 1994, she and the children left Houston with a family friend, Marta Velazquez, and her son, Moises. Desidiro and Enedine Plata, Estehla's parents were also on the trip. The group stayed in San Antonio for two

days. On July 20, 1994, they left San Antonio for Mexico. Marta and Estehla shared the driving. They traveled to Monterrey where they stayed with Estehla's sister, Leticia Ponce. During this part of the trip, the group did not experience a problem with the van.

On July 21, 1994, the group, accompanied by Leticia Ponce and her two children, Rocio and Alfonso, left for a day in the mountains around Monterrey. They spent the day at the Cola de Caballo tourist center. The group left the center around 3:00 p.m. with Marta driving. On their descent down the mountain, they noticed a burning smell. Marta stopped the van, and, along with Estehla and Desidiro, proceeded to check under the hood. They checked the oil, water, power steering fluid, and tires. There was nothing to indicate that there was a problem. The group waited about thirty minutes before they decided to re-enter the van and proceed down the mountain. A few moments after resuming their trip, Marta experienced trouble in braking and steering the van. Estehla attempted to help Marta steer the van, however, both women were unable to move the steering wheel. Thereafter, Estehla pulled on the parking brake to no avail. Neither Marta nor Estehla was able to control the movement and speed of the van. The van ran off the road at the edge of the mountain and tumbled into a ravine. All but Estehla were killed as a result of the accident.

Appellees[1] brought suit against Ford alleging that a fuel pump relay switch near the motor failed to operate properly. The fuel pump relay is responsible for transmitting an electrical output to the fuel pump for the purpose of providing fuel to the engine. In their petition, appellees alleged the defective design and manufacturing of the fuel pump relay. Appellees also alleged negligence. Suit was also brought against Miguel Velazquez, Elda Velazquez, and Geissi Velazquez (Velazquez) as representatives of the estate of Marta Velazquez on the basis of negligence. Velazquez then cross-claimed against Ford. Prior to trial, Ford filed a motion to transfer venue, a plea to the jurisdiction, a motion to apply the substantive law of Mexico, and a motion to dismiss in which it asserted the lack of subject matter jurisdiction.

During the trial, the jury heard testimony regarding the mini-relay system in the 1991 Aerostar van owned by Aguiniga. Testimony established that three relays, the wide-open throttle relay (WOT), electronic engine control relay (EEC), and fuel pump relay were housed in a protective housing known as a "doghouse." Each relay was designed with a plastic base, an internal iron, and a plastic snap that would snap the relay into place. Evidence regarding the testing of the EEC and fuel pump relays was introduced, as well as results gleaned from an examination of the Aguiniga van. In addition, a Ford exemplar van was also tested.

Evidence at trial included expert testimony for both sides. Dr. Rex McLellan, a professor of metallurgy, and Bob Swint, an electrical engineer, testified on behalf of the Aguinigas, the Ponces, and the Platas. McLellan's testimony addressed whether the engine in the Aguiniga van was operating at the time of the crash. He also testified regarding the physical condition of the relays. Swint also testified as to the condition and operation of the relays in the Aguiniga van. Ultimately, both experts opined that the fuel pump relay had become corroded before the accident, malfunctioned, failed to deliver the necessary electrical output to the fuel pump, and subsequently prevented the transmission of power to the engine. They testified

1. Plaintiffs include the following: Jorge and Maria Estehla Aguiniga, Alfredo Plata, Marie Estella Aguiniga, and Alfonso Ibarra Ponce. All with the exception of Plata, sued in their individual and representative capacity of the estates of the individuals who died in the accident. They are: Claudia, Cristal, and Jorge Aguiniga, Enedina and Desidiro Plata, and Leticia, Rocio and Alfonso Ponce.

that the lack of power stalled the engine, which in turn, immobilized the power brakes and steering. Ford submitted their own expert opinions asserting the opposite. Internal Ford documents regarding the relays were also admitted. Other evidence included the testimony of Estehla Aguiniga who testified as to what she recalled about the day of the accident. In addition, the videotaped deposition testimony of Mexican authorities who initially investigated the accident was also admitted.

The jury returned a verdict in favor of the plaintiffs, finding Ford liable for product defect and negligence. No liability was incurred by the Estate of Marta Velazquez. A judgment was entered by the trial court awarding plaintiffs actual damages.

### Venue

■ In its third issue, Ford contends that venue in Starr County was improper on the basis that it was fabricated on a feigned claim against co-defendant Marta Velazquez's estate. Appellees assert that venue was proper because Elda Velazquez, the estate's administrator, lived in Starr County. Consequently, because venue was proper for Velazquez's estate, it was also proper for Ford.

■ When a trial court's ruling on venue is challenged on appeal, we review the entire record, including the reporter's record from the venue hearing and from the trial on the merits. TEX. CIV. PRAC. & REM.CODE ANN. § 15.064(b) (Vernon 1986). *Wilson v. Texas Parks & Wildlife Dept.,* 886 S.W.2d 259, 261 (Tex.1994); *Bleeker v. Villarreal,* 941 S.W.2d 163, 167 (Tex. App.—Corpus Christi 1996, writ dism'd). As the reviewing court, we undertake an independent review of the record to determine whether venue was proper in the ultimate county of suit. *Wilson,* 886

S.W.2d at 261. Where there is probative evidence to support the trial court's determination, even if the preponderance of the evidence is contrary, we defer to the trial court's determination. *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 471 (Tex. 1995); *Ruiz v. Conoco, Inc.,* 868 S.W.2d 752, 757 (Tex.1993). Thus we review the record in the light most favorable to the trial court's ruling, but do not defer to application of the law. *Ruiz,* 868 S.W.2d at 758.

Ford properly filed a motion for change of venue in the present case. *See* TEX.R. CIV. P. 86(1). In its written motion and on appeal, Ford contends that the claim against Velazquez was an attempt to manufacture venue in Starr County. Ford bases its argument on the following:

1. After the accident, Marta Velazquez's daughter moved from Houston to Rio Grande City in Starr County. There she obtained an order from the county court at law as temporary administratrix of the estate.[2]

2. The Aguinigas and Ponces never served discovery requests on the estate, did not designate experts to give opinions that Marta Velazquez was at fault, and established that they were not seeking a claim against Velazquez's estate during jury voir dire.

3. Estehla Aguiniga testified at trial that she did not think Marta did anything wrong.

4. Plaintiffs sought to exclude Ford experts contending that the driver of the vehicle, Marta Velazquez, was at fault.

5. In closing argument, plaintiffs placed the entire blame on Ford.

Appellees Aguiniga, Ponce and Plata assert that Ford's failure to file responsive proof waived the issue of venue. Notwithstanding a waiver, they, along with appellee Velazquez, contend that there is suffi-

---

**2.** Meanwhile, the matter of Marta Velazquez's estate was still pending in a Harris County Probate Court. Elda Velazquez traveled to Houston and obtained an order appointing

her the permanent administratrix of her mother's estate. The probate court in Harris County also entered an order transferring the case to Starr County.

cient evidence to support the trial court's determination. We conclude that there is some probative evidence to support venue in Starr County.

Elda Velazquez's affidavit seeking appointment as temporary administratrix asserted that she was the only adult surviving daughter of the decedent Marta Velazquez. At the time the affidavit was signed and sworn, Elda was residing in Rio Grande City in Starr County. At jury voir dire, plaintiffs Aguiniga, Plata, and Ponce emphasized their need to "know who was responsible" and "apportion responsibility" for the accident. At the trial on the merits, Estehla Aguiniga testified that she was angry with Marta Velazquez, and thought that if she could have hit the mountain it would have saved everyone. Further, at the charge conference, plaintiffs Aguiniga, Plata, and Ponce objected to the trial court's instruction to the jury that if it found no liability on Ford's part it could return a verdict against defendant Estate of Marta Velazquez. These plaintiffs also objected to the charge which foreclosed a jury finding on damages where it failed to find Ford liable. Implicitly, plaintiffs Aguiniga, Plata, and Ponce sought damages against Velazquez's estate in the event Ford was not found liable. Furthermore, the record contains evidence to support the claim of negligence against Marta Velazquez's estate on the basis of driver error.

Our review of the entire record establishes that there was some probative evidence to support venue in Starr County. We find that Ford's citation to case law in which sister courts have held venue to be improper are inapplicable and can be distinguished as there was no evidence in those cases to substantiate a claim against the defendant in question. *See Acker v. Denton Pub. Co.*, 937 S.W.2d 111, 117 (Tex.App.—Fort Worth 1996, no writ) (cit-

ing that defendant's sole relation to the suit was that he was an officer of co-defendant company); *ACF Industries, Inc. v. Carter*, 903 S.W.2d 423, 424 (Tex.App.—Texarkana 1995, writ dism'd by agr.) (finding no evidence in the record and citing the fact that the trial court ordered a directed verdict against the defendant on which venue was based). Accordingly, we overrule Ford's third issue.

### Standing

■ In its fourth issue, Ford asserts that none of the appellees, with the exception of the Estate of Marta Velazquez, maintained the required standing to sue on behalf of the other estates.[3] Ford contends that none of the plaintiffs alleged or proved the required standing to sue or to recover on behalf of any of the estates other than Marta Velazquez.

■ As a component of subject matter jurisdiction, the issue of standing is reviewed by the same standard applicable to subject matter jurisdiction. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993). Where the issue of standing is first raised on appeal, we construe the petition in favor of the plaintiffs, and review the entire record to determine if any evidence supports standing. *Id.; see* TEX.R. CIV. P. 45.

■ Ford correctly contends that only a properly-appointed legal representative can sue on behalf of an estate, *see Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998); *Frazier v. Wynn*, 472 S.W.2d 750 (Tex.1971), however, its reliance on the general rule is misplaced. *See Johnson v. Holly Farms of Texas, Inc.*, 731 S.W.2d 641, 647 (Tex.App.—Amarillo 1987, no writ) (stating that where plaintiffs sue only as heirs they must properly allege and prove that no administration is pending or necessary before they can sue on behalf of

---

**3.** Here, Jorge and Estehla Aguiniga purported to sue on behalf of the estates of Vanessa, Cristal and Jorge, Jr. Estehla Aguiniga sued on behalf of the estates of Enedina Flores and Desidiro Plata. Alfonso Ponce sued on behalf of the estates of Leticia, Rocio, and Alfonso, Jr. Finally, Miguel Velazquez sued on behalf of the estate of Moises Velasquez.

a decedent's estate). Where plaintiffs are personal representatives, they are not required to prove their authority unless challenged by a plea in abatement or a verified denial. *Id.*

In the instant case, plaintiffs sued under the Texas Wrongful Death Statute as survivors of the decedents. *See generally* TEX. CIV. PRAC & REM.CODE ANN. § 71.021 (Vernon 1997). In their third amended petition, the Aguinigas and Ponce alleged that they were suing in their individual and representative capacity as surviving spouses, parents, and children of the decedents pursuant to the Act. In this capacity, the Aguinigas and Ponce sued as personal representatives of the estates of decedents.[4] Contrary to Ford's assertion, they did not merely allege this capacity in the caption and preamble of their petition. Ford failed to file a plea in abatement or verified denial contending that appellees did not maintain the legal capacity to sue.

Given the facts above, we conclude that Ford failed to properly challenge the Aguinigas', Platas', and Ponce's standing to sue. As such, the Aguinigas, the Platas, and Ponce were not required to prove their authority to sue. *See City of San Antonio v. Rodriguez,* 856 S.W.2d 552, 564 (Tex. App.—San Antonio 1993, writ denied) (refusing to apply *Frazier* in light of the fact that plaintiffs were suing as both heirs and as personal representatives of an estate); *accord Johnson,* 731 S.W.2d at 647 (stating that plaintiffs suing in their representative capacity under the wrongful death act need not prove their authority unless defendant files a plea in abatement or veri-

fied denial). We overrule Ford's fourth issue.

### Choice of Law

■ In its fifth issue, Ford contends that the claims in this case should have been governed by the substantive law of Mexico. Ford bases this assertion on the facts of the case: a vehicle, purchased in Louisiana, crashed off of a Mexican highway while it carried eight Mexican nationals who were subsequently hospitalized in a Mexican hospital. The accident was then investigated by Mexican authorities.

■ Choice of law is a mixed question of law and fact requiring identification of relevant contacts and a determination of which law applies. *See Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex. 1984). Accordingly, with regards to questions of fact, we defer to the trial court's determinations and review *de novo* its determinations of law. *Parra v. Larchmont Farms, Inc.,* 942 S.W.2d 6, 12 (Tex.App.—El Paso 1996), *reversed on other grounds,* 941 S.W.2d 93 (Tex.1997). In *Gutierrez v. Collins,* 583 S.W.2d 312, 319 (Tex.1979), Texas adopted the "most significant relationship" test to determine the choice of law as espoused under sections 6 and 145 of the Restatement (Second) of Conflicts of Law.[5] Under this test, we consider the following factual matters: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; (4) the place

4. Miguel Velazquez made similar allegations as to his representation of his son's estate, as the surviving parent of Moises Aaron Velazquez, a minor child.

5. Section 6 sets out the general principles involved in an analysis of the "most significant relationship" test with respect to forum which lacks statutory directive on the matter. Those factors include:

 (a) the needs of the interstate and international system,

 (b) the relevant policies of the forum,

 (c) the relevant polices of the other interested states and the related interests of those states in the determination of the particular issue,

 (d) the protection of justified expectations,

 (e) the basic principles underlying the particular field of law,

 (f) certainty, predictability and uniformity of results, and

 (g) case in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 6 (1971).

where the relationship, if any, between the parties is centered. *Id.;* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145 (1971). The number of contacts is not determinative, rather the qualitative nature of those particular contacts. *Duncan,* 665 S.W.2d at 421.

Initially, we identify the conflict of law which would necessitate the trial court to decide a choice of law issue. Here, Ford asserts that the amount of damages which plaintiffs could have recovered under Mexican law would have been limited. In Texas, those same damages would not have been limited. Next, we consider the relevant contacts, as they are determinative in identifying the governmental interests at stake. *See Duncan,* 665 S.W.2d at 421.[6] The following undisputed state contacts exist: thirteen Texas residents were plaintiffs below; Ford was a United States corporation conducting business in Texas; the van was inspected, licensed, registered, and primarily operated in Texas; and, the van was owned by Texas residents. Contacts with Mexico include the following: the accident occurred in Mexico; eight of the eleven people killed were Mexican nationals; the accident victims were hospitalized in Mexico; and Mexican authorities investigated the accident. Ford adds that while it may conduct business in Texas, the van in the present case was manufactured in Michigan and sold in Louisiana. Finally, we consider the governmental interests asserted by the parties. Ford contends that Mexico maintains a strong governmental interest in the operation of motor vehicles on its highways. Appellees, on the other hand, maintain that Texas has a strong interest in protecting its citizens, whether United States citizens or residents, from injuries resulting from defective products.

As a general rule, in matters of a tort or personal injury, the situs of the injury determines the rights and liabilities of the

parties. *See* RESTATEMENT (SECOND) CONFLICT OF LAWS § 146 (1971); James P. George, *Conflicts of Law: A Guide for Texas Attorneys,* 25 TEX. TECH L.REV. 833, 848–49. However, this rule of law reflects the old mechanical rules of *lex locus delecti* and *lex locus contractus.* George, 25 TEX. TECH L.REV. at 849. The former was rejected by the Texas Supreme Court in *Gutierrez.* And thus, we too do not consider it dispositive of the choice of law issue. *See De Aguilar v. Boeing Co.,* 47 F.3d 1404, 1413–14 (5th Cir.), *cert denied,* 516 U.S. 865, 116 S.Ct. 180, 133 L.Ed.2d 119 (1995).

Our review of this case established that Mexico has no interest in this litigation. Ford is a United States corporation, not a Mexican corporation. Defendant Marta Velazquez was a Texas resident and United States citizen. This fact establishes that neither defendant is a Mexican resident, citizen, nor business. Therefore, there is not a Mexican defendant who would be protected by the limitations in damages under Mexican law. *See also Baird v. Bell Helicopter Textron,* 491 F.Supp. 1129, 1141 (N.D.Tex.1980) (stating that British Columbia's interest in protecting its citizens from excess liability is not implicated if defendant is a Texan).

While purchased in Louisiana, the Aguiniga van was inspected and primarily operated in Texas. The majority of the individuals killed in the accident were Texas residents. *See Gutierrez,* 583 S.W.2d at 319 (stating that when two residents of the forum are involved in an accident in another state, the law of the forum applies). In addition, the majority of claimants suing are Texas residents.

Given these contacts, the only interest which exists is that of Texas. That interest is this state's strong policy in controlling corporate action in the manufacture of defective products. *See Vizcarra v. Rol-*

---

6. While a conflict of laws may exist, there may not be a problem where only the interest of one forum is in existence. That is, where

only one forum has an interest at stake, a "false conflict" arises. *See id.*

*dan,* 925 S.W.2d 89, 91 (Tex.App.—El Paso 1996, no pet.) Simply, Texas maintains an interest "in protecting its citizens from, and compensating them for, injuries resulting from defective products." *Baird,* 491 F.Supp. at 1150–51. Thus, Texas has an interest in protecting consumers from defective products such as the relays involved in the present case.

Ultimately, given Texas's interest and Mexico's lack of the same, there would appear to be a "false conflict" between U.S. and Mexico governmental interests which necessitates that Texas law apply. *See Duncan,* 665 S.W.2d at 422. Accordingly, we overrule Ford's fifth issue.

### Subject Matter Jurisdiction

■ In its sixth issue, Ford contends that the trial court lacked subject matter jurisdiction over the claims alleged.[7] A trial court's lack of subject matter jurisdiction is fundamental error and must be noted and reviewed by an appellate court any time it appears. *See Rogers v. Clinton,* 794 S.W.2d 9, 11 (Tex.1990). It is a question of law subject to *de novo* review. *See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998).

Section 71.031(a) provides that an action for damages under the wrongful death statute for death or personal injury of a citizen of this state, the United States, or a foreign country may be enforced in the courts of this state although the act causing death or personal injury occurred in a foreign state or country. Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3297, amended by Act of May 29, 1997, 75th Leg., R.S. ch. 424, § 3, 1997 Tex. Gen. Laws 1683 (current version at Tex. Civ. Prac. & Rem.Code Ann. § 71.031(a)(4) (Vernon Supp.1999)). In the case of a foreign citizen, "[that] country has equal treaty rights with the United State on behalf of its citizens." Tex. Civ. Prac. & Rem.Code Ann. § 71.031(a)(4) (Ver-

non Supp.1999). Contrary to the Aguiniga/Plata/Ponce brief, the application of this section has been treated as a question of jurisdiction. *See Owens–Corning Fiberglas Corp. v. Baker,* 838 S.W.2d 838, 841 & n. 2 (Tex.App.—Texarkana 1992, no writ); *Kazi v. Dubai Petroleum, Co.,* 961 S.W.2d 313 (Tex.App.—Houston [1st Dist.] 1997, writ granted).

■ In the present case, numerous treaties were referenced by appellees' expert asserting that equal treaty rights exist between the United States and Mexico. As in *Kazi,* appellees assert that the International Covenant of Civil and Political Rights, adopted by the U.S. on September 8, 1992, provides for reciprocal access to courts of justice in both the U.S. and Mexico. The Covenant, in pertinent part, provides that each state acknowledges that:

> All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by the law.

The International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 14(1), 6 I.L.M. 368. As noted by the court of appeals in *Kazi,* this provision effectively provides that (1) all persons shall be equal before their courts and tribunals and (2) "that the determination of rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law." *Kazi,* 961 S.W.2d at 316. We agree that such a provision imparts "equal treaty rights" pursuant to § 71.031. *See id.; see also Dow Chemical, Co. v. Alfaro,* 786 S.W.2d 674, 675 n. 2 (Tex.1990) (addressing whether a treaty between U.S. and Costa Rica imparted "equal treaty rights").

---

7. Six of the individuals who were killed in the accident were Mexican nationals including: Leticia Ponce and her two children Rocio and Alfonso, Jr., Enedina and Desidiro Plata and Moises Velazquez.

In *Alfaro,* the Texas Supreme Court reviewed the Treaty of Friendship, Commerce, and Navigation (FCN) between the U.S. and Costa Rica which provides:

The citizens of the high contracting parties shall reciprocally receive and enjoy full and perfect protection for their persons and property, and shall have free and open access to the courts of justice in the said countries respectively, for the prosecution and defense of their rights; and they shall be at liberty to employ, in all cases, the advocates, attorneys, or agents of whatever description, whom they may think proper and they shall enjoy in this respect the same rights and privileges therein as native citizens.

*Id.* The Court, in dictum, stated that "equal treaty rights" under § 71.031(a) required the existence of language "similar" to the treaty between the U.S. and Costa Rica. Based on this dictum, the court in *Kazi* compared the International Covenant on Civil and Political Rights with the FCN treaty quoted *in Alfaro.* We agree, and find that the International Covenant of Civil and Political Rights is sufficiently similar to the FCN treaty approved by the Texas Supreme Court in *Kazi.*

Because the United States and Mexico are signatories of the multilateral International Covenant on Civil and Political Rights and this treaty imparts "equal treaty rights" to the citizens of both countries, we hold that the requirements of § 71.031 are fulfilled to establish the trial court's subject matter jurisdiction. We overrule Ford's sixth issue.

### Expert Testimony

In its second issue, Ford asserts that appellees' expert testimony lacked a reasonable scientific basis. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 555 (Tex.1995). Specifically, Ford contends that the expert testimony of Swint and McClellan were inadmissible because (1) the reliability factors of *Robinson* were not established, in particular the absence of testing; (2) alternative causes were not considered; and (3) neither expert was qualified to give opinions with regard to automobiles. Appellees concede that the testimony of these witnesses may not conform to the *Daubert/Robinson* factors. However, they contend that such factors are not exclusive, and reliability can be achieved based upon the expertise and skill of the expert testifying. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 720 (Tex. 1998).

Evidentiary rulings, including rulings on expert testimony, are reviewed under an abuse of discretion standard. *See Robinson,* 923 S.W.2d at 558. We will not overturn a decision of the trial court unless the record indicates that the court abused its discretion. Where an expert's testimony lacks a reliable scientific basis, its admission by the trial court constitutes an abuse of discretion. *Purina Mills, Inc. v. Odell,* 948 S.W.2d 927, 932–34 (Tex. App.—Texarkana 1997, no writ). When reviewing the sufficiency of the evidence supporting a jury finding, unreliable scientific evidence is the legal equivalent of no evidence at all. *See Havner,* 953 S.W.2d at 711–12.

Generally, the testimony of an expert is opinion testimony. Whether it rises to the level of evidence is determined under the rules of evidence. *See generally* Tex.R. Evid. 702. Rule 702 guides the trial court in determining whether expert testimony will assist the jury in its determination. *Havner,* 953 S.W.2d at 712. Under Rule 702, all expert testimony must be determined to be both reliable and relevant before it is admitted into evidence. *Id.* To assist a court in determining the reliability of expert testimony, the supreme court in *Robinson* espoused the follow factors to consider: (1) the extent to which the theory has been tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether

the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory. *See Havner,* 953 S.W.2d at 714; *Robinson,* 923 S.W.2d at 557. In *Robinson,* the Texas Supreme Court made clear that these factors are nonexclusive and will differ with every case and the nature of the evidence.

█ In *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 722–26 (Tex.1998), the Texas Supreme Court considered whether the *Daubert/Robinson* factors should be applied to both scientific and non-scientific evidence. The difference between both types of evidence is that the former is based on the application of scientific principles, while the latter is based on skill or on experience based on observation. *Carmichael v. Samyang Tire Inc.,* 131 F.3d 1433, 1435 (11th Cir.1997) *cert. granted sub nom., Kumho Tire Co. v. Carmichael,* —— U.S. ——, 118 S.Ct. 2339, 141 L.Ed.2d 711 (1998). In *Gammill,* the Texas Supreme Court acknowledged that the *Daubert/Robinson* factors cannot always be used with non-scientific expert testimony. *Gammill,* 972 S.W.2d at 726–27. In deciding whether the trial court in *Gammill* abused its discretion, the Texas Supreme Court added a more general analysis whether "there is simply too great an analytical gap between the data and opinion proffered." *Id.* (citing *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997)). Ultimately, this test assigns the trial court the role of gatekeeper of determining reliability of particular testimony to be assessed. *Gammill,* 972 S.W.2d at 727.

█ We agree with appellees that the testimony of Swint and McLellan does not fit all the enumerated factors of *Robinson,* and therefore apply the more general reliability test espoused by *Gammill.* In doing so, we must determine whether there is an "analytical gap" between the data and the opinions preferred. Ford asserts that the experts' techniques relied entirely upon subjective interpretation, not on any objective data or experimentation, and that no data was compiled. Therefore, we must first examine the objective data that was available to the experts.

Based on the testimony of Estehla Aguiniga, the experts knew that the brakes and steering capability of the van had failed. Aguiniga testified that Velasquez could not brake despite pumping the brake pedal, and neither woman was able to move the steering wheel. Pictures taken of the Aguiniga van in a Mexican police yard in Santiago revealed that both the EEC and fuel pump relays were hanging outside of "the doghouse" and laying on their side. In addition, dirt and splash markings in the doghouse and the nature of the corrosive staining inside "the doghouse" indicated that the EEC and fuel pump relays were outside "the doghouse." Both experts observed the presence and size of corrosion debris inside the EEC and fuel pump relays. While Ford introduced evidence that the town of Santiago received rainfall during the two week period after the accident, there was no evidence with regard to whether this rainfall ever hit the area of the Mexican police yard where the van was stored. Barry Richard, another of plaintiffs' experts, testified that his examination of the van did not reveal signs of water entry or that the van had been rained upon. Further, Ford's own expert testified that once a relay was out of "the doghouse" it was susceptible to becoming corroded within one to three months of falling out. Ford's warranty and return documents indicated corrosion problems with relays which had fallen out of the protective "doghouse" casement. Moreover, it was observed by plaintiffs' expert that where the fuel pump relay failed in an exemplar van the failure of the brakes and steering would be consistent with the failure described by Aguiniga. Based on the marks and indentations noted on metal

parts and pulleys of the Aguiniga van engine, McLellan determined that the engine was not running at the time of impact. Finally, mechanical failure of the brakes was ruled out as a possible cause.

Swint testified that he had eliminated other possible causes of engine failure due to stalling, including the ignition switch, the wiring harness, the inertia switch, and the fuel pump itself. He was left with only the EEC and fuel pump relays as the primary candidates for failure. When tested, the fuel pump relay from the Aguiniga van failed. The corrosion on the fuel pump relay was a direct result of the water and air reacting with the metal of the fuel pump relay. Corrosion trapped inside the body of the relay switch inhibited the proper function of the relay switch. To test this theory, Swint used paper of a similar size and nature to the corrosive particle. He concluded that a corrosive particle could have caused the engine to stall and ultimately lead to the failure of the brakes and steering.

We find that the above constituted objective data upon which Swint and McLellan relied in reaching their opinions. Therefore, we do not conclude that an "analytical gap" existed between the underlying data and the expert opinions of Swint and McLellan to render the latter inadmissible.

On appeal, Ford also contends that Swint and McLellan failed to test other possible causes. While *Robinson* does allude to the absence of consideration of alternative causes as a basis for an expert's opinion, we must consider this factor in light of the facts of this particular case. In *Robinson*, an expert sought to testify that contaminated Benlate caused injury to the plaintiffs' pecan orchard. However, the expert admitted in his deposition that the symptoms exhibited could have been caused by something other than Benlate. The expert had failed to rule out the other causes. 923 S.W.2d at 559.

Our review of the record reveals that Ford misstates the record in asserting that other causes for an engine stall were not eliminated. In this case, there is no admission by an expert that the stalling of the engine in absence of any coughing or sputtering could have been caused by any other system in the Aguiniga van other than the electrical system, which was fully tested. Ford presented no evidence of another system failure or cause which could have led to engine stall. Swint testified to examining and ruling out the ignition switch, wiring harness, inertia switch fuel pump, and any other sources which could lead to engine stalls. Thus, contrary to Ford's assertion, the assertion that Swint's testimony amounted to mere speculation must fail. Swint was not merely asserting a possible cause, but had in fact narrowed the cause to one source. He eliminated other possible causes for the engine stall and explained his reasons for doing so. As a result, he concluded that it was the corrosion in the fuel pump relay which led to the engine stall, which in turn, led to the failure of the van's brakes and steering. From its pre-trial motion to exclude to its post-verdict motions, Ford did not develop an argument beyond its assertion that Swint's and McLellan's testimony was pure speculation. At trial, defense counsel did not attempt to impeach either Swint or McLellan with any evidence that another system failure caused the engine to stall or the brakes and steering to fail. In light of these facts, we find that McLellan's and Swint's testimony can be distinguished from the expert testimony in *Robinson*.

Finally, Ford contends that neither Swint nor McLellan was qualified to give their opinions because neither had experience in the automobile industry. We would first note that it is questionable whether either expert's qualifications were sufficiently challenged below to raise the issue on appeal.[8] *See* Tex.R.App. P. 33.1.

---

8. Ford fails to direct our attention to the

record where it challenged either McKellan's

Nonetheless, we would conclude that Swint's and McLellan's background qualified them to testify. In *Gammill*, the Court held that a mechanical engineer with no automotive background should not be permitted to testify regarding design defects in a vehicle's accelerator or restraint system. 972 S.W.2d at 719. We find that the present case is distinguishable from *Gammill* based on the nature of the experts' testimony and their qualifications.

 McLellan, as a metallurgist, testified regarding metallurgical qualities of the relay, the corrosion effect on such relays, and the markings of different automotive parts. No particularized knowledge of an automobile's manufacture and design, although helpful, was necessary to examine the automobile parts as they were placed in the Aguiniga van. Swint, as an electrical engineer, testified to the effect of relay failure and other alternative designs. With an extensive background in researching and designing relays, he was qualified to discuss the internal workings of relays in general and the manner they should be designed.

We conclude that the trial court did not abuse its discretion in permitting McLellan and Swint to testify. Therefore, we reject Ford's argument that their testimony was unreliable. We would further find that McLellan and Swint were qualified to testify. Accordingly, we overrule Ford's second issue.

### No Evidence

 In its first issue, Ford contends that the evidence was legally insufficient because it required the drawing of inferences from equally competing inferences, *see Wal–Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex.1998); *Arguello v. Gutzman*, 838 S.W.2d 583, 588 (Tex.App.—San Antonio 1992, no writ), and also inference stacking. *See Browning–Ferris, Inc.*

v. *Reyna*, 865 S.W.2d 925, 927 (Tex.1993). In other words, Ford asserts that the evidence did no more than suggest that the accident might have resulted from a corroded electrical relay that caused the engine to stall. At best, according to Ford, such a cause amounted to a mere possibility.

 In reviewing a no evidence challenge to the verdict, we must consider all of the record evidence in the light most favorable to the party in whose favor the verdict has been rendered, and indulge every reasonable inference deducible from the evidence in that party's favor. *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998); *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998). Under this standard, our scope of review extends to all the evidence. *Id.* Where there is any evidence of probative force to support the finding, we must overrule the challenge and uphold the finding. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

Ford sets forth an eight-step chain of facts that it asserts must be supported by evidence to prove the appellees' case. Our review of the record establishes that each fact can be supported by some circumstantial evidence.

First, there is the assertion that at the time of the impact, the engine was not running so that it must have stalled before the accident. Kirk testified that no skid marks were on the road that matched the path of the van's flight from the road. McLellan testified that there were no markings on the transmission oil cooler, pulleys and belts which demonstrated that the engine was not running. Furthermore, Aguiniga testified that the brakes and steering had failed. All this evidence is consistent with an engine stall.

---

or Swint's qualifications. While objections were raised as to the speculative nature of their testimony and their lack of expertise in

the law, no objection was entered as to their qualifications.

Second, there is the assertion that the engine caused the loss of steering and brakes. Barry Richard testified regarding tests which he performed which resulted in steering and brake failure as a result of fuel pump relay failure. Testing was also conducted which ruled out the mechanical failure of the brakes.

Third, there is the assertion that the failure of the fuel pump relay while the engine is running will stall the engine. Richards testified, according to his testing results, once the fuel pump relay fails, the engine will die from the lack of fuel in 2.2 seconds without coughs or spurts.

Fourth, there is the assertion that a fuel pump relay which is corroded will fail. Ford's own warranty returns indicated relays returns for relays which had failed due to corrosion. The corroded fuel pump relay from the Aguiniga van failed testing. Finally, Ford's own expert testified that a corroded relay would fail.

Fifth, the assertion that a relay outside of the protective housing will probably corrode and fail. Once again, Ford's own expert testified that a relay outside of the housing will corrode within one to three months. Additional testimony was heard by the jury that once a relay is outside of its "doghouse," depending on the location, it is subject to greater exposure to road splash and water from the windshield. The jury was able to see that the WOT relay, which was properly placed in position in "the doghouse," experienced no corrosion. Finally, there were Ford documents acknowledging the existence of corrosion due to water entry.

Sixth and seventh, there was the assertion that the fuel pump relay in the Aguiniga van was outside of its housing and corroded before the accident. McLellan's and Swint's testimony which compared the pattern of water and debris markings in the EEC and the fuel pump relay compartment with other compartments in the relay "doghouse" indicated that the relays were outside of their compartments. Ford warranty documents indicated a history of relay fall outs in Ford Aerostar vans.

Eighth, there was the assertion that the accident was caused by a corroded fuel pump relay. This opinion was drawn from the foregoing. Assuming that it was an inference, it was supported by Swint's testimony and his elimination of other possible causes.

A product can be unreasonably dangerous because of the defect in manufacturing, design or marketing. *Uniroyal Goodrich Tire, Co. v. Martinez*, 977 S.W.2d 328, 335 (Tex.1998). To prove a design defect, a claimant, must establish, among other things, a safer alternative design. *Id.; see Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex.1995). The Texas Supreme Court has held that the safer alternative design must be reasonable in that it can be implemented without destroying the utility of the product. *Id.*

We find that the above evidence constituted sufficient evidence of defective design. Given the existence of circumstantial evidence to support the assertions above, we disagree with Ford's contention of inference stacking or that appellees' assertions amounted to no more than mere suspicion. *See Browning–Ferris, Inc.*, 865 S.W.2d at 927; *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex.1995).

In addition to the above evidence, the record contained evidence of the existence of safer alternative design. The ISO relay was being used on other Ford automobiles prior to the manufacture of the Aguiniga van. According to Ford's experts, the ISO relay was a superior relay because it did not have weep holes and was less susceptible to water entry and corrosion. The ISO relay, however, did not appear in Ford Aerostar vans until 1993 or 1994. In addition, there was evidence that Ford could have simply placed the relay in a more protected environment rather than implement a different relay design. Ford experts testified that the EEC and fuel

pump relays could have been installed in a fully enclosed unit or located the housing unit in an alternative location less susceptible to water entry in 1991 Aerostar vans, but were not.

After viewing all the probative evidence in the light most favorable to the verdict, we conclude that the above evidence constituted more than a scintilla of evidence. Because we conclude that there is some evidence to support the judgment of the trial court on the theory of products liability we need not consider appellees' claim of negligence. Accordingly, we overrule Ford's first issue.

The judgment of the trial court is affirmed.