**Opinion issued May 2, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-01033-CV

_____

## IN THE INTEREST OF D.D.M., J.C.M., AND J.D.M., JR., CHILDREN

On Appeal from the 300th District Court
Brazoria County, Texas
Trial Court Case No. 89321-F

## MEMORANDUM OPINION

Appellant Jamile Matthews appeals after having his parental rights to his two children terminated. He contends that the evidence was legally and factually insufficient to support the termination and the trial court abused its discretion by appointing the Department of Family and Protective Services as permanent managing conservator of the children. Because the undisputed evidence of

Matthews's conduct both before and after losing custody of his children prevents a reasonable factfinder from forming a firm belief or conviction that Matthews engaged in conduct that endangered the physical and emotional well-being of his children under Family Code section 161.001(b)(1)(E), we reverse the trial court's termination order. We affirm the trial court's conservatorship order, however, because of the less stringent evidentiary and appellate-review standard and because the trial court reasonably concluded that appointing Matthews as managing conservator would not be in the children's best interest.

**Background**

Appellant Jamile Matthews is the biological father of two children, five-year-old D.D.M. and six-year-old J.D.M., the subjects of this suit. Matthews ended his relationship with the children's biological mother after he found out that she was having multiple affairs. One of the affairs resulted in the mother having another child, six-year old J.C.M. Although Matthews was not J.C.M.'s biological father, she called Matthews "daddy" and otherwise treated him as her father. After the couple split up, Matthews lived with his sister at her apartment, and the children stayed at the mother's apartment. The mother had another child, M.N., with yet another man after her relationship with Matthews ended.

Sometime after the couple split up, Matthews learned through Facebook messages that some men at the mother's apartment were "whooping on [his] kids."

2

Matthews called the police and asked them to conduct a welfare check on the children. A man living with the mother later spoke with Matthews over the phone and asked why he called "the police to come out and check on [the] kids." The record does not indicate how or if the police actually conducted the welfare check, but it is clear that the children were not taken from the mother. Matthews was still concerned that men at the mother's apartment were abusing his children, so he attempted to get the children from the mother's apartment himself.

After a friend drove him to the mother's apartment, Matthews approached and knocked on the mother's door. He heard through the door a man on the inside say, "This is your baby daddy at the door." Then he heard a gun cock. Matthews quickly moved away from the door and returned to his friend's car, but he did not leave; he was still worried about the safety of his children. He looked back at the door to the mother's apartment and saw that it had been opened. Matthews turned to his friend and said, "Look here, man. I am here to try to get one of my kids." He then went back up to the door and saw his son D.D.M. Matthews grabbed D.D.M., returned to the car, and left. Matthews later reflected that, had the opportunity presented itself without the risk of being shot, he would have taken all of the children.

In early winter 2016, after Matthews got D.D.M. from the mother's house, he called the police for a second time and asked that they check again on the children at the mother's apartment. The police told him that there was nothing they could do

3

because DFPS had already taken the children from the home. This was news to Matthews. DFPS then sent a caseworker to the sister's apartment where Matthews was staying with D.D.M. The caseworker explained to him that J.C.M. and J.D.M. were taken from the mother on November 22, 2016, after DFPS discovered that the mother's boyfriend had drowned two-month-old M.N. in a toilet because he would not stop crying.[1] Within a week, DFPS filed an original suit seeking custody of J.C.M. and J.D.M.

The following month, Matthews's sister kicked him and D.D.M. out of her apartment. While on a bus with D.D.M., Matthews called DFPS and informed it that he had been kicked out of sister's house. He explained that he and D.D.M. were going to a relative's house to see if they could stay there or otherwise receive help. Later that same day, Matthews informed DFPS that his sister was allowing him and D.D.M. to stay at her house but that she wanted him out within thirty days. Three days later, Matthews called DFPS again. He informed it that he would not be able to find a place to stay before his sister would kick him out. Matthews stated that he only had $80 of food stamps and four diapers and that he would be not capable of properly caring for D.D.M. after being kicked out. As he put it, "I didn't want [D.D.M.] to sleep on the fence like I had to." DFPS asked Matthews if he understood

---

[1] The man who murdered M.N. was later convicted and sentenced to life in prison. *See Gorman v. State*, No. 01-18-00316-CR, 2019 WL 610739 (Tex. App.—Houston [1st Dist.] Feb. 14, 2019, no pet.) (mem. op.).

4

that he was asking it to take his child from him. He stated that he understood, and DFPS took D.D.M. into its care.

On January 23, 2017, DFPS filed an original petition seeking custody of D.D.M. This case was consolidated with DFPS's earlier petition that sought custody of J.C.M. and J.D.M.[2] DFPS provided Matthews with a family-services plan that laid out requirements he had to satisfy to ensure that his parental rights were not terminated. The requirements included that he "participate in random drug testing"; "complete drug and alcohol assessments" if he tested positive on a drug test; "complete a psychological evaluation"; "participate in individual therapy"; and "maintain a safe and stable home environment as well as maintain employment."

By the time trial began in September 2018, Matthews had taken four drug tests. The first was a leg-hair test on October 2, 2017. He tested positive for methamphetamine at a level indicating "very heavy use"; he also tested positive for marijuana. The second was a urine test a day later. He again tested positive for methamphetamine. The third was another leg-hair test, conducted on January 10, 2018. He tested positive for methamphetamine, marijuana, and cocaine. The fourth was also a leg-hair test. It was conducted on April 4, 2018, and returned positive for

---

[2]    DFPS also sought termination of the mother's parental rights as well as the parental rights of J.C.M.'s biological father. The trial court terminated the mother's rights as to D.D.M., J.D.M., and J.C.M. and the parental rights of J.C.M.'s biological father. Neither the mother's or J.C.M.'s father's terminations are before us.

methamphetamine. Matthews completed his final drug test, another leg-hair test, on September 21, 2018, eight days after trial began. The final test returned positive for methamphetamine and ecstasy.

Trial testimony revealed that Matthews completed his psychological evaluation and the drug and alcohol assessment, he was participating in individual therapy, he had been living in a safe home with his new girlfriend for four months, he was working forty hours a week at McDonald's earning $8.45 an hour, and he never missed a visit with his children. Matthews testified that he and his girlfriend were capable of paying their rent, utilities, and other expenses and would have enough money left over to cover food, education, medical, and related expenses for D.D.M. and J.D.M. A DFPS caseworker testified that the children loved their father and enjoyed their visits with him.

The same caseworker explained that J.D.M. was diagnosed with "mood disorder and conduct disorder, oppositional defiant disorder, and ADHD." She explained that, in DFPS care, J.D.M. is enrolled in weekly therapy to address these disorders. The caseworker testified that D.D.M. has "impulse control and conduct disorder and ADHD" and that he is currently in "play therapy." The caseworker averred that it was DFPS's position Matthews's rights should be terminated and that the children should not be split apart but be placed together.

6

The trial court also heard testimony from a Court Appointed Special Assistant. The CASA worker testified that the father's rights should not be terminated. When asked why, the CASA worker replied:

> I'm at all the visits that [Matthews] has. He is very bonded with the children. They children are very bonded with him. Could he take care of them all the time? I haven't seen that yet. But they do . . . look forward to him. They do interact with him. Yes, they do wear him out, but there's a bond there. There's a definite bond.

The trial court struggled with this complex case. The trial court explained that it was clear that the children were bonded to and loved Matthews. It rejected DFPS's argument that Matthews placed the children in a situation that endangered their emotional and physical safety when he took D.D.M. from the mother's apartment but left the other children there, noting "it was clear from the evidence he didn't want to leave the child there" but felt that he had to or risk serious physical harm to either himself or the children. Nevertheless, the trial court concluded that Matthews's drug tests indicated, at the very least, that he used illicit drugs two months before trial, and that it was likely he used drugs during trial.

The trial court noted that Matthews's drug use was problematic both because he was well aware of the fact that his parental rights were in question, yet he still used drugs, and because his testimony was entirely inconsistent on his drug use: At first, when Matthews was asked about his drug use, he "plead the Fifth," then he claimed to have never used any drugs, and then—after repeated questioning—he

admitted to using drugs at some point in the past. Accordingly, the trial court concluded that, by using illicit drugs, Matthews engaged in conduct that put the children's physical and emotional well-being at risk. For this reason, in addition to all of the other evidence presented, the trial court concluded that termination would be in the children's best interests. Accordingly, the trial court terminated Matthews's parental rights.

**Analysis**

Matthews challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that he engaged in conduct that endangered the physical or emotional well-being of his children under Family Code section 161.001(b)(1)(E), and the trial court's finding that termination of his parental rights would be in the children's best interests under Family Code section 161.001(b)(2). Matthews also challenges the trial court's appointment of DFPS as the permanent managing conservator of the children.

## I. Legal and factual sufficiency

It is well-established that a suit affecting the relationship between parents and their children implicates a natural right that is "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)); *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994). And when the government seeks to terminate that natural right, constitutional-based

8

protections activate: Legislation that authorizes involuntary termination is strictly construed, the government must justify termination with "clear and convincing evidence," and termination orders are strictly scrutinized. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *cf. Ray v. Burns*, 832 S.W.2d 431, 434 (Tex. App.—Waco 1992, no writ) (in reviewing sufficiency of the evidence, "close calls" go to the parent" (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 168 (Tex. 1990)). "Clear and convincing" denotes that "measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

In a proceeding to terminate a parent-child relationship brought under Family Code section 161.001, DFPS must prove two elements by clear and convincing evidence: It must establish a predicate-statutory violation by showing one or more acts or omissions enumerated under section 161.001(b)(1), and it must demonstrate that termination of parental rights is in the children's best interests. TEX. FAM. CODE § 161.001(b)(1), (2); *In re B.L.D.*, 113 S.W.3d 340, 353–54 (Tex. 2003). Proof of one element cannot obviate proof of the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976).

This clear-and-convincing-evidence standard renders the typical standards of review for legal- and factual-sufficiency challenges inadequate. *In re J.F.C.*, 96

9

S.W.3d 256, 264–68 (Tex. 2002). To assess the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* at 266; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 814–17 (Tex. 2005). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. Where "no reasonable factfinder could form a firm belief or conviction" that the matter on which DFPS bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id.* In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* (citing *C.H.*, 89 S.W.3d at 25). The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

We turn to the legal and factual sufficiency of the evidence for the predicate-statutory violation under section 161.001(b)(1). The trial court found that Matthews "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child"—a predicate-statutory violation under section 161.001(b)(1)(E). At trial, DFPS relied on the facts recited above but aimed its primary focus on Matthews's drug-test

results. Matthews's drug-test results reveals that he used drugs at least two months before trial began—a time in which he was well aware that his parental rights were hanging in the balance. DFPS argued, and the trial court agreed, that this drug use demonstrated that Matthews engaged in conduct that endangered the physical and emotional well-being of his children.

Under section 161.001(b)(1)(E), "endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* TEX. FAM. CODE § 161.001(b)(1)(E). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). A parent's conduct, however, need not be directed at the child, nor must the child have actually suffered injury. *Id.* And a parent's drug use exposes children "to the possibility that the parent may be impaired or imprisoned" and may therefore constitute endangerment of the child's emotional and physical well-being. *Walker v. Tex. Dep't of Fam. & Prot. Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory*

11

*Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)).

Matthews contends that, notwithstanding his drug use, the undisputed evidence showing that he consistently put the needs of his children first precludes a reasonable factfinder from forming a firm belief or conviction that he endangered his children. We agree. DFPS presented no direct evidence that Matthews was using illicit drugs while D.M.M. was in his care. DFPS's expert witness testified that a drug test of a person's leg hair can, at most, indicate whether that individual used drugs within the last six months. The first drug test was on leg hair from Matthews that was collected on October 2, 2017. This leg-hair test revealed that he had methamphetamine and marijuana in his system. According to the expert testimony, this test indicated that, within the last six months, Matthews used marijuana and methamphetamines. Six months before that October 2017 test was April 2017—four months after Matthews called DFPS to pick up D.D.M.

Although parental misconduct that occurs after the child's removal from parental custody may be viewed as evidence of the parent engaging in conduct that endangers the child, *see K.P.*, 498 S.W.3d at 171–72, the cases that have invoked this post-removal-conduct principle have uniformly treated post-removal conduct as supplemental evidence that termination is appropriate under section 161.001(b)(1)(E). *Id.* (holding subsection (E) termination justified by mother's

untreated bipolar disorder and depression, use of drugs while she had custody of other child, lack of stable home, and drug use after removal); *In re J.V.B.*, No. 01-17-00958-CV, 2018 WL 2727732, at *7–8 (Tex. App.—Houston [1st Dist.] June 7, 2018, pet. denied) (mem. op.) (holding subsection (E) termination justified by parents neglect of child's medical needs, failure to provide basic needs, and drug use both before and after removal); *In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *4–5 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) (holding subsection (E) termination justified by mother's drug use before removal that resulted in incarceration, father's possession of child while he manufactured and used methamphetamine, mother's subsequent arrest for public intoxication in presence of child, and mother's testing positive for illicit drugs post removal); *In re L.L.P.*, No. 01-16-00699-CV, 2017 WL 817167, at *7–9 (Tex. App.—Houston [1st Dist.] Mar. 2, 2017, pet. denied) (mem. op.) (holding subsection (E) termination justified by mother's repeated leaving of two-week old and eight-year old in care of fourteen-year old, mother's testing positive for cocaine after vehicle accident that injured child, mother refusing to participate in family-service plan, and drug use after removal).

The case law suggests that a parent's drug use alone is insufficient to terminate a parent-child relationship under subsection (E). *See In re D.J.J.*, 178 S.W.3d 424, 429–30 (Tex. App.—Fort Worth 2005, no pet.) (holding termination under

subsection (E) was improper where there was no evidence that parents' drug use created an environment that endangered children or that it threatened emotional or physical well-being of children); *see also In re J.E.H.*, 384 S.W.3d 864, 871 (Tex. App.—San Antonio 2012, no pet.) (father's positive cocaine test was insufficient to support termination because evidence did not show how father's drug use endangered child).

For example, in *Walker*, this court recognized that drug use exposes children "to the possibility that the parent may be impaired or imprisoned" and may therefore "support termination under section 161.001(1)(E)," but the court also made clear that it was not the parent's drug use alone that justified termination under subsection (E): "The evidence presented with respect to Walker's pattern of crime, imprisonment, drug use, and violence against family members demonstrates a deliberate course of conduct from which a reasonable trier of fact could have found that Walker endangered W.J.W.'s emotional and physical well-being." *Walker*, 312 S.W.3d at 618. Similarly, in *Vasquez*, although this court acknowledged the absence of "direct evidence [that] appellant's drug use or neglect actually injur[ed] Z.M.," the court highlighted the plethora of other evidence "TDPRS presented [showing] that appellant engaged in a course of conduct that endangered Z.M.'s physical and emotional well-being":

> The evidence at trial supporting [termination] includes: (1) a continued
> pattern of drug use without regard for the effects that it had on the

14

children, including one child's having tested positive for drugs at birth and the appearance of appellant's having been "high" while caring for the children, including Z.M., as noted by a case worker during visits to the home; (2) appellant's failure to remain drug-free while under TDPRS's supervision, knowing that such conduct could place her children, including Z.M., at risk; and (3) the case worker's observation of incidents indicating appellant's negligent supervision (Z.M.'s being left unattended near a filled bathtub with another child in the tub and M.R.M.'s exiting the home into high-traffic areas), without appellant's showing a willingness to take corrective measures, such as child proofing the home.

*Vasquez*, 190 S.W.3d at 196.

Here, in contrast, other than Matthews's drug use, the record contains no evidence that Matthews endangered his children.[3] "[W]hile 'one slender bit of evidence' may be all a reviewing court needs to affirm a verdict based on the preponderance of the evidence, a higher burden of proof," like the clear-and-convincing standard applicable here, "requires a higher standard of review." *City of Keller*, 168 S.W.3d at 817 (citing *Jackson v. Virginia*, 443 U.S. 307, 320 n.14 (1979)). Accordingly, we "cannot 'disregard undisputed evidence that allows of only one logical inference'; rather we "must consider *all* the evidence (not just that favoring the verdict)." *Id.* at 814, 817 (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d

---

[3] Although DFPS also attempted to show that Matthews "knowingly placed or knowingly allowed [his children] to remain in conditions or surrounding which endanger the physical or emotional well-being of the child" under Family Code section 161.001(b)(1)(D) by removing D.D.M. from the mother's apartment but leaving J.D.M., the trial court rejected the argument and DFPS does not cross-appeal that conclusion.

15

513, 519–20 (Tex. 2002); *J.F.C.*, 96 S.W.3d at 266). The evidence here is undisputed, and it demonstrates Matthews's ability to put the needs of his children first.

When Matthews was first made aware through messages on Facebook that his children may have been abused by men staying at the mother's apartment, he called police and asked them to conduct a welfare check. After the call, he discovered that his children were still in the mother's apartment. His concern for their safety compelled him to attempt to take the children from the mother's apartment himself. Despite hearing a gun cock and believing that the man inside the mother's apartment intended to harm him, Matthews seized the opportunity to remove D.D.M. from the environment in the mother's apartment—the same environment that resulted in two-month-old M.N.'s murder. Then, when Matthews realized he would not be able to satisfy D.D.M.'s needs after his sister planned to kick him out of her apartment, Matthews had the protective foresight to realize that D.D.M. could not stay out on the streets with him, so he called DFPS before being kicked out and asked it to pick up D.D.M. He explained that he did not want D.D.M. sleeping outside with him and that he could not ensure the child's best interests would be met while he was homeless. DFPS explicitly asked him "if he understood that he was asking [DFPS] to pick up and take temporary care of his son, [and] he stated he did understand."

16

Then, while his children were in DFPS's care, Matthews found a safe home, obtained a full-time job, and completed his psychological assessment. Although Matthews tested positive for drugs five times, he completed drug and alcohol assessment. He never missed a visit with his children, and, according to the CASA worker, his bond with his children was very strong. Matthews also explained that he and his girlfriend reviewed their expenses, including rent, utilities, phone bill, and related costs, and believed they would have enough money left over to cover food, education, medical, and related expenses for D.D.M. and J.D.M. At the time of trial, he was in the process of completing the final requirement of the family-services plan, individual therapy. All of the evidence demonstrating these facts was undisputed.

We stress the unique circumstances of this case. DFPS argues only that the trial court properly concluded that Matthews committed a predicate-statutory violation under section 161.001(b)(1)(E). The evidence of endangerment was limited solely to Matthews's drug use; the remaining evidence was undisputed and demonstrated Matthews's ability to put the needs of his children first, even if it meant losing them. In light of the constitutional concerns related to parental termination, clear instructions from the supreme court to strictly scrutinize termination proceedings and strictly construe involuntary-termination statutes, and our obligation to consider undisputed evidence that is contrary to the verdict, we hold that when viewed in the light most favorable to the judgment, the record evidence

17

precludes a reasonable factfinder from forming a firm belief or conviction that Matthews engaged in conduct that endangered his children's physical or emotional well-being.

## II.    Conservatorship

Matthews also challenges the trial court's appointment of DFPS as the sole managing conservator of his children. Specifically, he challenges the trial court's finding that his "appointment . . . as permanent managing conservator of the children is not in the children's best interests because the appointment would significantly impair the children's physical health or emotional development."[4]

We review a trial court's conservatorship decision for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if its decision is arbitrary and unreasonable. *Id.* Unlike parental-termination orders, which are subject to a clear-and-convincing-evidence standard, conservatorship orders are governed by a preponderance-of-the-evidence standard. *Id.*

---

[4]    As evidenced by the language of the trial court's order, its conservatorship decision was supported by a finding that was independent of the findings underlying its termination decision. *Accord In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (reversing conservatorship order "[b]ecause the trial court made no findings . . . that would independently support the conservatorship order, [meaning] the Department's appointment was solely the consequence of the trial court's [erroneous] termination decision").

Throughout the trial, the trial court repeatedly stressed its concern with Matthews's drug use. According to DFPS's expert, a leg-hair drug test like the one taken by Matthews will indicate a positive a result for methamphetamine if the leg hair contains 300 or more picograms of methamphetamine. The father's leg hair had over 20,000 picograms, an amount the expert averred reflected "very heavy use," likely "daily use." Given the abuse-of-discretion and lightened-evidentiary standards applicable to conservatorship decisions, *see J.A.J.*, 243 S.W.3d at 616, the recognition that a parent's narcotics use negatively affects his life and ability to parent, *see Walker*, 312 S.W.3d at 618, and the evidence of Matthews's drug-use, we conclude that the trial court did not abuse its discretion by appointing DFPS as sole managing conservator.

In appointing DFPS as the sole managing conservator of the children, the trial court granted the department all "the rights and duties specified in § 153.371, Texas Family Code." Among those rights and duties is "the right to have physical possession . . . of the child." Despite our conclusion that the trial court's termination order was erroneous, our conclusion that its conservatorship order was proper means that DFPS, in its sole discretion as sole managing conservator, may decide that giving the father possession of the children would not be best for the children at this time. Nevertheless, this does not mean that the father must always be subject to DFPS's judgment when it comes to deciding who has possession of his children.

"The trial court retains jurisdiction to modify a conservatorship order if it is in the child's best interest, and the parent's or child's circumstances have materially and substantially changed since the order was rendered." *J.A.J.*, 243 S.W.3d at 617 (citing TEX. FAM. CODE §§ 156.001, 156.101).

## Conclusion

We reverse the order of the trial court terminating the father's parental rights but affirm the order of the trial court appointing DFPS as sole managing conservator.

Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.