

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-16-00344-CV

**IN THE INTEREST OF A.A.T.**, a Child

From the 63rd Judicial District Court, Val Verde County, Texas
Trial Court No. 31,313
Honorable Enrique Fernandez, Judge Presiding

Opinion by: Marialyn Barnard, Justice

Sitting: Sandee Bryan Marion, Chief Justice
Marialyn Barnard, Justice
Jason Pulliam, Justice

Delivered and Filed: December 28, 2016

AFFIRMED

This is an appeal from a trial court's order terminating appellant mother's ("Mother") rights to her child, A.A.T.[1] On appeal, Mother contends: (1) the trial court erred in excluding certain testimony from Mother's expert; (2) the evidence is legally and factually insufficient to support the jury's findings under section 161.001(b)(1)(D), (E), and (O); and (3) the evidence is legally and factually insufficient to support the jury's finding that termination was in A.A.T.'s best interest. We affirm the trial court's order.

---

[1] After all parties rested and closed, A.A.T.'s father ("R.T.") signed an affidavit of voluntary relinquishment. He is not a party to this appeal.

**BACKGROUND**

The record shows the Texas Department of Family and Protective Services ("the Department") first became involved with Mother in November 2013, when the Department received a referral regarding Mother's fourth child, J.G. At that time, in addition to J.G., Mother had three older children, A.R., A.N., and C.N. She was also pregnant with A.A.T., who was born in July 2014 and is the child who is the subject of this parental termination appeal. After his birth, A.A.T. was removed by the Department based on injuries suffered by J.G.[2] Because the facts in J.G.'s case directly affect A.A.T.'s case, we begin with the applicable facts from J.G.'s case as background.

According to Mother's testimony, when she returned home from work on November 19, 2013, she noticed injuries to J.G.'s face. Mother testified her mother ("Grandmother") said J.G. had fallen off the bed onto the wood floor. Mother and her four children lived with Grandmother, and Grandmother watched J.G. while Mother was at work. Mother took J.G., who was approximately seven months old at the time, to the emergency room for injuries to both sides of his face and his forehead. The evidence established that medical personnel believed the injuries were the result of abuse — specifically, the injuries on each side of the face were made by strikes, i.e., slaps, to the baby's face. The emergency room doctor, Teofilo Sanchez, testified the injuries appeared older than stated and at least the injuries to each side of the baby's face appeared to be the result of multiple slaps with a hand. Dr. Sanchez stated the injuries fit neither with the timeline presented by Mother and Grandmother, nor with the claim of a fall from a two-foot high bed. Admittedly, in his report, Dr. Sanchez stated the injuries were the result of a fall. However, Dr. Sanchez testified he placed this in his report because at the time the cause of J.G.'s injuries was

---

[2] By this time, J.G. and his three older siblings had already been removed by the Department based on injuries suffered by J.G.

disputed. And, indeed, the Department was contacted by the hospital and opened a case, placing the matter in family-based services. Grandmother was no longer permitted to care for the children, who were placed in a protective daycare while Mother was working.

On December 13, 2013, J.G. was examined by pediatrician James Louis Lukefahr of the Center for Miracles ("the Center"). The Center reviews and provides expert consultations with regard to the medical aspects of child abuse investigations. Dr. Lukefahr testified he reviewed the emergency room records and agreed with Dr. Sanchez that J.G.'s facial injuries were not the result of a fall, but a result of a series of hand slaps to the face — slaps Dr. Sanchez described as "fairly forceful." Because there were questions regarding the cause of J.G.'s facial injuries — abuse as opposed to a fall — Dr. Lukefahr ordered a skeletal survey to determine if J.G. had suffered any broken bones as a result of the November incident; none were found.

Around Christmas time, Mother, accompanied by R.T., returned to the hospital with J.G., who was suffering from congestion. He was prescribed medication and thereafter, Mother took him home. On December 31, 2013, Mother testified that at approximately 2:00 a.m., she was awakened by J.G., who was crying and fussy. Mother denied he was upset at any point earlier in the day. As she changed his diaper, she noticed his left leg was swollen. Mother testified she believed he might be suffering from a reaction the previously prescribed medication, so she took J.G. to the emergency room. Again, R.T. accompanied them to the hospital.

At the emergency room, an X-ray revealed J.G. had suffered two fractures to his left leg just above the ankle. Dr. Lukefahr subsequently described these fractures as a "pretty dramatic fracture of the left tibia just above the ankle," and a "pending fracture" of the fibula.[3] According to Department caseworker Melanie Torres, Mother suggested that perhaps one of her older

---

[3] Dr. Lukefahr testified a fracture is referred to as "pending" when it occurs in small children where the bone is bent, but not completely broken.

children had accidentally dropped J.G., resulting in the fractures. J.G.'s leg was placed in a cast and he was again referred to the Center for additional examination. Dr. Lukefahr conducted a second full skeletal survey of J.G. on January 17, 2014. At that time, the skeletal survey revealed three additional fractures: (1) two fractures to the left arm — both the ulna and radius were broken close to the left wrist, and (2) a single fracture to radius — the larger bone — of the right arm.

Dr. Lukefahr testified the arm fractures showed signs of healing, and therefore, were more than ten days old. A radiologist estimated they were two to three weeks old. Thus, J.G. it appeared suffered five fractures in the span of less than one month. Dr. Lukefahr stated J.G. would have been in pain and would have likely cried and screamed at least for the first few hours after the fractures, perhaps as long as two days. Moreover, he would have stopped using his arms. Mother claimed she was unaware of the fractures — other than the previously diagnosed fracture to the left leg, testifying she did not notice any damage or signs of pain. Dr. Lukefahr testified "a reasonable mother would have known something serious was wrong with the child."

As for the left leg fractures, the doctor stated the "bone was also bent pretty significantly," "angulated," and that some kind of force was used to "snap that bone and bend it off in an angle." He said it would have required "really a significant amount of force" to be applied to cause the fractures, which he opined occurred simultaneously.

Mother suggested J.G.'s injuries were caused: (1) when his older siblings dropped him; (2) by organic bone issues — Vitamin D deficiency, metabolic bone disease, Osteogenesis Imperfecta; or (3) when he was aggressively pulled from a crib with slats at daycare. Dr. Lukefahr testified J.G.'s injuries were not consistent with being dropped by a sibling — the siblings were of a young age and the height at which they would have held J.G. was not sufficient to cause the injuries, and J.G. was not of an age where he could have held his arms out to catch himself in such a fall. Dr.

Lukefahr opined the arms fractures required "a lot of force," and it was unlikely they were the result of a fall. Dr. Lukefahr's opinion was the same regarding the leg fractures.

As to alleged organic causes for J.G.' injuries, Dr. Lukefahr stated he tested J.G. to rule out a vitamin deficiency or metabolic bone disease. Dr. Lukefahr also ruled out Osteogenesis Imperfecta — not by genetic testing — but once J.G. was removed from the home, he suffered no additional fractures. The doctor opined that if a child has multiple fractures over the course of a month, but none thereafter, the child does not suffer from Osteogenesis Imperfecta. In a subsequent skeletal survey, no new fractures were found.

One of the managers from the protective daycare testified and provided evidence that the daycare did not use slatted cribs at the time J.G. was there. Although Mother and R.T. testified they saw such cribs when they picked the children up from daycare, the director stated that at the time of J.G.'s care, only netted bassinets were used for infants in accordance with mandated requirements. According to the director, the slatted cribs were removed and replaced in January 2013, eleven months before J.G. began attending.

As set out above, the Department submitted evidence from doctors and others to establish J.G.'s injuries were the result of abuse. As for the facial injuries, the Department admitted in discovery responses they were caused by Grandmother, but subsequently suggested this may not have been the case — based on who the Department believed caused the multiple fractures. The Department presented evidence that beginning in October 2013 and through the end of the year (and perhaps to date), Mother was engaged in a relationship with R.T., becoming pregnant with A.A.T early on in the relationship. R.T. is admittedly the father of A.A.T, but he is not the father of any of Mother's other children, including J.G. The evidence suggested all of J.G.'s fractures occurred during the course of the relationship — though both Mother and R.T. denied the existence of any relationship in the past or present. There was evidence R.T. was in the home during the

times J.G. was injured — though he and Mother denied it. Mother's three oldest children made statements to their current caregiver that R.T. hit them with a belt or spanked them when they asked for food, cried, or refused to get up in the morning.[4] R.T. claimed he never really spent any time in the home and had little to do with the children. Yet, all three children described R.T. as "mommy's boyfriend," and even stated they were told by Mother to call him "dad." They also stated R.T. grabbed J.G. by the leg and pulled it, causing J.G. to hit his head on the floor, and there was some evidence from Mother and R.T. that he was in the home the day before J.G.'s leg fractures were discovered.

Ultimately, the Department sought to terminate Mother's parental rights to J.G. and her three older children based primarily on the injuries to J.G. Specifically, the Department alleged Mother: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children, who had been in the Department's custody for more than nine months as a result of removal for abuse or neglect. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O) (West Supp. 2016). The Department also alleged termination would be in the children's best interests. After a jury trial, the jury found Mother violated the provisions of the Code as alleged by the Department and that termination would be in the bests interests of the children. *See In re A.A.R.*, 04-15-00464-CV, 2016 WL 231964, at *5 (Tex. App.—San Antonio 2016, no pet.) (mem. op.); *see also* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). In accordance with the jury's verdict, the trial court

---

[4] A.R., A.N., and C.N. were placed with the paternal grandmother of A.N. and C.N. J.G. was later placed in the home as well.

signed an order terminating Mother's parental rights to A.R., A.N., C.N., and J.G. Mother appealed to this court, challenging the sufficiency of the evidence supporting the jury's findings of the statutory grounds for termination. *A.A.R.*, 2016 WL 231946, at \*1. We affirmed the order of termination, holding the evidence was sufficient, both legally and factually, to establish Mother violated subsection (E), i.e., she engaged in conduct or knowingly placing her children with persons who engaged in conduct that endangered the physical or emotional well-being of her children. *Id.* at \*6; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

After A.A.T.'s removal, the Department prepared a new service plan for Mother (and R.T.) with a stated goal of reunification. The trial court held the statutorily-required status and permanency hearings. Ultimately, the Department moved to terminate Mother's parental rights to A.A.T., asserting the same grounds as in the previous termination action. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). After a lengthy final hearing, at which Mother appeared with appointed counsel, a jury found Mother: (1) knowingly placed the children or allowed the children to remain in conditions that endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with someone who engaged in conduct that endangered their physical or emotional well-being; and (3) failed to comply with the provision of a court order that specifically established the actions necessary for her to obtain the return of A.A.T., who had been in the Department's custody for more than nine months as a result of removal for abuse or neglect. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). The jury also found termination of Mother's parental rights would be in A.A.T.'s best interest. *See id.* § 161.001(b)(2). Accordingly, the trial court rendered an order terminating Mother's parental rights. Thereafter, Mother perfected this appeal.

## ANALYSIS

As noted in the introduction, Mother contends: (1) the trial court erred in excluding certain testimony from Mother's expert; (2) the evidence is legally and factually insufficient to support the jury's findings under section 161.001(b)(1)(D), (E), and (O), *see id.* § 161.001(b)(1)(D), (E), (O); and (3) the evidence is legally a factually insufficient to support the jury's finding that termination was in A.A.T.'s best interest. *See id.* § 161.001(b)(2). We will address the trial court's exclusion of the expert testimony first.

### *Exclusion of Expert Testimony*

In her first issue, Mother contends the trial court erred in excluding testimony from her expert, Dr. Marvin E. Miller. Although the trial court determined Dr. Miller, a pediatric geneticist and pediatrician, is an expert in genetics, it concluded his hypothesis of temporary brittle bone disease ("TBBD"), which the doctor also referred to as metabolic bone disease, was unreliable, failing to meet the standards required under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995).

### *Standard of Review*

Appellate courts review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015); *Ford Motor Co. v. Aguiniga*, 9 S.W.3d 252, 262 (Tex. App.—San Antonio 1999, pet. denied). This includes rulings on the reliability of expert testimony. *Gharda USA, Inc.*, 464 S.W.3d at 347; *Aguiniga*, 9 S.W.3d at 262. A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *In re R.O.C.*, 131 S.W.3d 129, 134 (Tex. App.—San Antonio 2004, no pet.) (citing *Robinson*, 923 S.W.3d at 558). A reviewing court should not find an abuse of discretion simply because it might have ruled differently or because the trial court committed a mere error in judgment. *Id.* at 134–35. "Admission of expert testimony

that does not meet the reliability requirement is an abuse of discretion." *Gharda USA, Inc.*, 464 S.W.3d at 347–48 (quoting *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006)). In other words, when "an expert's testimony lacks a reliable scientific basis, its admission by the trial court constitutes an abuse of discretion." *R.O.C.*, 131 S.W.3d at 135 (quoting *Aguiniga*, 9 S.W.3d at 262). Exclusion of evidence, even if erroneous, does not entitle an appellant to a reversal unless the exclusion probably resulted in an improper judgment. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 161 (Tex. 2015); *see* TEX. R. APP. P. 44.1(a)(1).

*Application*

The crux of the decision to terminate Mother's parental rights to her four older children and to seek termination of her rights as to A.A.T. was based on the numerous fractures suffered by J.G. in the span of approximately one month, and in light of those injuries, Mother's failure to recognize risks to her children and acknowledge the abuse suffered by J.G. Mother's expert, Dr. Miller, sought to opine that J.G. suffered from TBBD or metabolic bone disease, which Dr. Miller described as referring to multiple unexplained fractures ("MUFs") in infants. The Department filed a motion to exclude Dr. Miller's testimony, alleging it was unreliable.

Expert testimony is most commonly presented in the form of an opinion. *Aguiniga*, 9 S.W.3d at 262. Thus, it is "especially important" a for trial court to scrutinize such evidence for "scientific reliability," particularly when it is based "upon novel scientific theories, sometimes referred to as 'junk science.'" *Robinson*, 923 S.W.2d at 554. Whether a proffered opinion rises to the level of admissible evidence is determined by the rules of evidence. *See generally* TEX. R. EVID. 702; *Aguiniga*, 9 S.W.3d at 262. Rule 702 requires that an expert be qualified "by knowledge, skill, experience, training, or education," and that his testimony assist the trier of fact in understanding the evidence or determining a fact in issue. TEX. R. EVID. 702. In addition, expert testimony must be relevant — sufficiently tied to the facts of the case such that it will aid

the jury in resolving a factual dispute — and reliable — grounded in the methods and procedures of science, i.e., more than subjective belief or unsupported speculation. *Robinson*, 923 S.W.2d at 556; *Aguiniga,* 9 S.W.3d at 262. In *Robinson*, the Texas Supreme Court espoused six factors that it determined would be helpful in determining whether expert testimony is reliable: (1) the extent to which the theory underlying the expert's testimony has been tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory. *See Robinson*, 923 S.W.2d at 556–57. However, application of these factors does not preclude a trial court from measuring an expert's methodology under the analytical gap analysis set out in *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 726 (Tex. 1988). *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 215–16 (Tex. 2010); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 579 (Tex. 2006). Under this analysis, the trial court must determine whether there is "too great an analytical gap between the data and the opinion proffered." *Crump*, 330 S.W.3d at 215–16 (quoting *Gammill*, 927 S.W.2d at 726) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). In other words, the two methods of review are not mutually exclusive. *Crump*, 330 S.W.3d at 215–16; *Tamez*, 206 S.W.3d at 579. As the court reiterated in *Crump*:

> [I]n very few cases will the evidence be such that the trial court's reliability determination can properly be based only on the experience of a qualified witness to the exclusion of factors such as those set out in *Robinson*, or, on the other hand, properly be based only on factors such as those set out in *Robinson* to the exclusion of considerations based on a qualified expert's experience.

330 S.W.3d at 216 (quoting *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009)).

At the *Daubert/Robinson* hearing, Dr. Miller testified to his belief in the existence of temporary brittle bone disease, which he also referred to as metabolic bone disease. Dr. Miller

opined that the presence of certain factors in infants with MUFs could indicate the presence of such disease. Dr. Miller opined the disease could result in fractures in infants — fractures that might otherwise be determined to have resulted from abuse — even during normal care routines.

Dr. Miller advised that he undertook a study of MUFs in infants in 1994. He then explained his research process from which he concluded the following factors are indicative of the existence of metabolic bone disease, i.e., TBBD: (1) maternal and/or infant Vitamin D deficiency; (2) fetal bone loading; (3) gestational diabetes; (4) intrauterine growth retardation; (5) maternal use of medication; (6) premature birth; and (7) the existence of Ehlers-Danlos Syndrome. Dr. Miller stated a child with the hypothesized disease usually does not have bruising, but will on occasion. And he admitted there would be swelling if the fracture were to a "long bone." To his knowledge, there was no mention of any swelling or bruising to the J.G.'s arms, suggesting to him the existence of metabolic bone disease.

As to Mother and J.G., Dr. Miller stated "there was historical evidence that some of the risk factors *might* be present." Dr. Miller admitted, as to Vitamin D deficiency, that in March 2014, J.G. tested in the normal range, but because this was several months after the fractures were found, he *could not* make a judgment as to the possible existence of a deficiency at that time. He opined Mother *might* have had this risk factor because of her BMI, but he did not know. He also opined that because Mother was "relatively small" and J.G. was of normal birth weight, there *might* have been intrauterine growth retardation due to confinement — this *might* have caused decreased bone density in the womb. He also opined, though he had no proof, that Mother *might* have suffered from Ehlers-Danlos Syndrome because she reported that she bruises easily, suffers from constipation, and suffers dizziness when she stands. There is no diagnostic test for the syndrome. Dr. Miller thought that if Mother suffered from the syndrome, J.G. *might* as well, and those with

the syndrome have lower bone density and are at a slightly greater risk of fractures than the general population.

Based on his research and subsequent hypothesis of the possible existence of metabolic bone disease, i.e., TBBD, in infants with MUFs, Dr. Miller opined there "is a strong possibility" that J.G.'s fractures resulted from metabolic bone disease, i.e., TBBD. He further advised that J.G.'s x-rays "looked abnormal . . . and were consistent with what I call metabolic bone disease." He noted "abnormal bone mineralization" in certain bones. He said this raised the strong possibility that J.G.'s fractures were not necessarily caused by abuse, but the fractures could be "fragility fractures" that could occur during routine handling of a young infant with metabolic bone disease, i.e., an infant with "a skeletal system that's weaker than normal," or even during the skeletal surveys. However, he admitted it was not possible to make an accurate judgment of bone density simply based on an x-ray unless there is osteopenia, i.e., "a washing out of the bone."

On cross-examination, Dr. Miller stated his belief that J.G.'s x-rays appeared abnormal prompted him to "look for the risk factors" he believes indicate the existence of metabolic bone disease of TBBD. He acknowledged that while in Mother's care, J.G. suffered numerous fractures, but once removed, he suffered no additional fractures. He said J.G.'s condition "seem[ed] to be" temporary. In Dr. Miller's view, J.G. suffered the disease based on what happened while he was in the womb, but that over time, the condition resolved itself.

According to Dr. Miller, he initially used the phrase TBBD, but because the phrase was "politically charged" and metabolic bone disease is "more comprehensive," he started using the phrase metabolic bone disease instead of TBBD. He admitted the chairman at Wright University where he works had advised him three or more years ago to stop doing consulting work with regard to TBBD. He conceded the concept of TBBD is controversial, acknowledging that many pediatric

child abuse specialists do not believe in its existence. He further conceded the idea that a Vitamin D deficiency causes brittle bones in infants is also very controversial.

Dr. Miller admitted he never spoke directly to Mother, nor did he examine her or J.G. He was unable to say with reasonable medical certainty that Mother or J.G. had a Vitamin D deficiency. Similarly, he could not say whether Mother or J.G. suffered from Ehlers-Danlos Syndrome. Dr. Miller admitted J.G. was a full-term infant and there is no evidence any medication taken by Mother during pregnancy would have led to metabolic bone disease. He acknowledged there was no evidence Mother suffered from gestational diabetes or that J.G. suffered from intrauterine growth retardation. Dr. Miller also admitted fractures that result from his theory of metabolic bone disease "usually occur" in the first six months of an infant's life. However, it is undisputed that no fractures were noted in J.G. until he was seven months old. He concluded by admitting he could not rule out the possibility that J.G. was abused, resulting in the noted fractures.

Dr. Miller's testimony, when considered as a whole, shows Dr. Miller could not say for certain that Mother or J.G. suffered from *any* of the risk factors he contends are indicative of infantile metabolic bone disease. Dr. Miller was able to opine only that Mother and/or J.G. *might* have had three of seven noted risk factors. Thus, he was unable to show his pre-determined risk factors — even assuming their presence is indicative of the existence of his hypothesized metabolic bone disease — supported a conclusion of metabolic bone disease with regard to J.G. *See Gammill*, 972 S.W.2d at 726–27. There was an analytical gap between Dr. Miller's data and his proffered opinion that J.G. suffered from metabolic bone disease, resulting in the fractures. *See id.*

Moreover, the Department presented evidence from expert Dr. Maria Gisela Mercado-Deane, a pediatric radiologist and consultant for the Center. Dr. Mercado-Deane, after establishing her qualification, first testified about a conference she attended just two weeks before the

termination hearing. She testified the conference, which was entitled "The Imaging of Child Abuse: From Exam Room to X-ray Room to Court," drew attendees from the fields of child abuse and neglect, pediatrics, radiology, orthopedics, neurology, and emergency medicine. According to the doctor, Dr. Miller's theory of metabolic bone disease was discussed at the conference where it was criticized. Dr. Mercado-Deane testified Dr. Miller's theories "are not accepted in the community of child abuse experts." She stated his ideas have not been proven, stating they are pure speculation. The doctor advised there has not been any publication establishing proof with regard to Dr. Miller's ideas and theories.

Dr. Mercado-Deane pointed to an article entitled "Critical Review of Temporary Brittle Bone Disease," which was prepared by the ad hoc committee on child abuse for the Society for Pediatric Radiology ("SPR"). The article was endorsed by both boards for the SPR and the European Society for Pediatric Radiology ("ESPR") at their 2005 meeting. In that article, the members of SPR and ESPR stated the purpose of the article was "to instruct courts on the most current and widely accepted imaging methods and to refuse expert testimony that lacks a sound medical basis." The members sought to "expose irresponsible medical expert testimony in the field of pediatric diagnostic imaging." In that article, the authors discuss Dr. Miller's theory of TBBD, refuting it and specifically stating the methodology and reliability of the theory is wrong and unreliable. In the article, the authors stated that the key concept "in this alleged condition is that a young infant had a problem that made the bones susceptible to fractures for a short period of time, but the condition resolved spontaneously, leaving no pathology to identify." The authors advised it was their "professional responsibility to provide the courts with reliable scientific information" and "a diagnosis of TBBD does not meet this standard because it lacks appropriate grounding in scientific methods and procedures." The authors stated the theory "is based on the unsupported speculation and subjective beliefs of [a] small number of medical professionals," and

allowing the presentation of evidence in court on this theory creates a grave risk that non-scientific fact finders will be misled or confused by "unreliable and/or irrelevant expert opinion." The authors of the article concluded this would threaten the quality of legal decisions and poses "an unacceptable risk to the safety of children." In sum, the article strongly advised evidence on the theory of TBBD should not be admitted as evidence in court.

Dr. Mercado-Deane then pointed to a second article published in February 2016 — just a month before trial — entitled "The Etiology and Significance of Fractures in Infants and Young Children: A Critical Multidisciplinary Review." According to the doctor, the article was put together by a coalition of experts from the SPR and includes information regarding Vitamin D deficiency and brittle bones, among other things. In the article, the authors concluded Vitamin D deficiency "does not have direct correlation to bone disease." As Dr. Mercado-Deane pointed out, this refutes Dr. Miller's assertion that Vitamin D deficiency is indicative of metabolic bone disease, i.e., TBBD. The article specifically advised that courts are not proper forums for the presentation of "new or unsubstantiated theories of causation of disease." The article concluded the "[c]ourts can avoid promulgating unsubstantiated and unsafe theories and opinions by relying on medical and ethical guidelines from," among others, "the Society for Pediatric Radiology and the American Academy of Pediatrics." And, as is particularly pertinent here, the article stated:

> As an example, the Committee on Child Abuse of the Society for Pediatric Radiology helped refute the legitimacy of temporary brittle bone disease, ***a disease that has not been proven to exist***.

(emphasis added)

The doctor also contradicted Dr. Miller's assertion that x-rays of J.G.'s bones showed "loose zones." She testified the zones described by Dr. Miller were actually the result of "normal healing of a fracture." Dr. Mercado-Deane stated the healing fractures were not indicative of mineralization issues, opining that J.G.'s bones were "normal in mineralization."

As to some of the information relied upon by Dr. Miller in developing his theories, particularly a study by Dr. Kathy Keller and Dr. Patrick Barnes, Dr. Mercado-Deane testified the study was flawed — not just in her opinion, but in the opinion of several commentary authors. The Keller and Barnes study was for the purpose of engendering discussion, not as an answer to infant fractures. The doctor provided detailed criticism of the study. She also noted that in 2013, an article advised that "[t]he hypotheses set forth in Keller and Barnes thus remain hypothetical and unsubstantiated," and "[p]erhaps better stated, the hypotheses of Keller and Barnes have been disproved." According to Dr. Mercado-Deane, when Dr. Keller presented her findings at the 2008 annual meeting of the SPR, people left because the presentation was "so outrageously not accepted, and there were [sic] even some booing."

Dr. Mercado-Deane testified, in sum, that the prevailing thought about TBBD among pediatric radiologists and child abuse experts is that it does not exist. Put another way, she stated Dr. Miller's ideas regarding metabolic bone disease are not generally accepted by pediatricians or other medical doctors. She stated Dr. Miller's ideas about TBBD cannot even be categorized as a theory; rather, he merely has opinions because there is no proof, only conjecture. The doctor stated there are two peer-reviewed articles on TBBD — one by Dr. Miller and one by Drs. Keller and Barnes — and both have been refuted. And, in fact, there are numerous medical articles that state TBBD is not a valid theory and does not, in fact, even exist. The doctor stated her concern regarding presentation of Dr. Miller's ideas to a jury, stating that she fears jurors might interpret his ideas as "proved science when it is not." She then went through each of the factors Dr. Miller opined might be attributable to J.G. and/or Mother and testified that none of them have a proven association with the type of bone fragility Dr. Miller discusses.

The Department also presented evidence from Dr. Lukefahr at the *Daubert/Robinson* hearing.[5] As previously noted, Dr. Lukefahr is a child abuse pediatrician and is board certified in both general pediatrics and child abuse pediatrics. Dr. Lukefahr testified that during his career, he has become familiar with the idea of TBBD. He stated that as a pediatrician, he does not recognize such a disease. Although he knows many other pediatricians, he does not know of one that endorses the ideas propounded by Dr. Miller. According to Dr. Lukefahr, the idea "defies logic," stating:

> [T]he idea that a child could suddenly develop a medical condition at the age three months or so that is then totally gone by 12 months, it's not logical, it doesn't — it defies common sense. And in actual fact, it does turn out that there's no scientific evidence that's ever been put forward to support it.

Dr. Lukefahr pointed to two articles that contradict Dr. Miller's ideas. First, in an article entitled "Vitamin D Status in Abused and Nonabused Children Younger Than 2 Years Old With Fractures," the authors stated that low Vitamin D levels are common in the United States, but there is no difference in such levels between children with fractures due to abuse and children with fractures due to accidents. Thus, according to Dr. Lukefahr, this strongly suggests that low Vitamin D levels are not associated with increased fractures, disqualifying law Vitamin D as a "factor" for Dr. Miller's theory. The second article, "Evaluating Infants and Young Children With Multiple Fractures," is a clinical report from the committee on child abuse and neglect of the American Academy of Pediatrics. The report is prepared by the committee, but then it goes through five or so levels of review with the Academy before it is released. Relevant here, the article, which Dr. Lukefahr testified is the "kind of thing" he follows in his work, states that a few articles have hypothesized the existence of TBBD, but the existence of such a disease "is neither

---

[5] Mother challenged Dr. Lukefahr's testimony under *Daubert/Robinson*. Thus, some of his testimony at the hearing related to his qualifications and the reliability of his opinions, as well as his testimony as to the lack of reliability of Dr. Miller's theory of metabolic bone disease, i.e., TBBD.

clinically validated nor generally accepted by expert professionals and *should not be invoked to explain multiple fractures in an infant*." (emphasis added). According to the article the idea that an infant's bones are especially vulnerable to fractures for a short period of time due to some unknown metabolic abnormality or due to decreased fetal movement in utero is neither valid nor generally accepted.

As to J.G., Dr. Lukefahr testified his bone chemistry and architecture were normal. He was seven months old before his first fracture, sustained all the fractures in a short time period, and then the fractures ceased after that. Thus, there is nothing to suggest J.G. has any kind of underlying bone disease, "including hypothetical bone diseases." Dr. Lukefahr stated J.G.'s Vitamin D levels were normal within two weeks of the onset of his fractures, negating the idea of fractures resulting from Vitamin D deficiency. He reviewed Mother's prenatal records and found her pregnancy "uneventful." Given the records show normal movement by J.G. while in the womb, it is unlikely there was fetal bone loading. Dr. Lukefahr also discounted the existence of Ehlers-Danlos Syndrome, which he stated is not associated with bone fractures, as well as intrauterine growth retardation. According to Dr. Lukefahr, if there had been intrauterine growth retardation, it would have been reflected in lower birth weight, but J.G. was seven pounds, twelve ounces at birth — normal. He also noted J.G. was a full-term baby — discounting another possible factor as set forth by Dr. Miller.

Finally, although Dr. Miller claimed some bone scientists have advised him his ideas have merit, even he admitted his ideas have received criticism. In fact, according to Dr. Miller, another doctor wrote an editorial critical of the concept of TBBD, which appeared in a peer-reviewed journal.

When we consider the *Robinson* factors, several seem inapplicable, including the extent to which the theory has been tested and the potential rate of error. *See Robinson*, 923 S.W.2d at 557.

However, Dr. Miller's theory regarding the existence of metabolic bone disease, i.e., TBBD, has been negatively peer-reviewed in several publications. *Id.* And, the evidence shows his ideas are based on his subjective interpretation regarding the existence of the factors that in his opinion denote the existence of metabolic bone disease. And, the Department provided evidence from two experts who testified Dr. Miller's theory has not been generally accepted by the relevant community. *Id.* Dr. Mercado-Deane even denounced it as a theory, describing as merely an idea. Moreover, the Department presented through its witnesses several medical articles that specifically renounced the existence of such a disease. *Id.* As stated by one of those articles, the existence of such a disease "is neither clinically validated nor generally accepted by expert professionals and should not be invoked to explain multiple fractures in an infant." Finally, it seems that if Dr. Miller's theory has been used only for judicial purposes — for the specific purpose of defending parents accused of abuse. *Id.*

Based on the foregoing, we hold the trial court did not err in excluding Dr. Miller's testimony relating to metabolic bone disease, i.e., TBBD. The Department presented sufficient evidence for the trial court to conclude, in its discretion, that Dr. Miller's theory was unreliable due to an analytical gap between the data and his conclusion and under the *Robinson* factors. *See Gammill*, 972 S.W.2d at 726–27; *Robinson*, 923 S.W.3d at 557.

### *Legal and Factual Sufficiency*

In two issues, Mother challenges the legal and factual sufficiency of the evidence regarding the findings under section 161.001(b)(1) and the finding that termination was in the best interests of A.A.T. pursuant to section 161.001(b)(2). We will address each challenge in turn. We begin by setting out the standard of review, which is applicable to Mother's challenges under both section 161.001(b)(1) and 161.001(b)(2) of the Texas Family Code ("the Code").

*Standard of Review*

A parent's right to her child may be terminated only upon proof by clear and convincing evidence that: (1) the parent committed an act prohibited by section 161.001(b)(1) of the Code; and (2) termination is in the best interest of the child. *Id.* § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re B.R.*, 456 S.W.3d 612, 615 (Tex. App.—San Antonio 2015, no pet.). "Clear and convincing evidence" is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see J.O.A.*, 283 S.W.3d at 344; *B.R.*, 456 S.W.3d at 615. Because termination of parental rights results in permanent and unalterable changes for both parent and child, courts have held due process is implicated, requiring the use of the heightened clear and convincing standard of review. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2015); *In re D.M.*, 452 S.W.3d 462, 468–69 (Tex. App.—San Antonio 2014, no pet.); *In re E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio 2012, pet. denied). Given the foregoing, we must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction that a parent violated an alleged statutory ground and termination was in the child's best interest. *A.B.*, 437 S.W.3d at 502; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

In reviewing a legal sufficiency challenge in termination cases, we view the evidence in the light most favorable to the trial court's findings and judgment, and resolve any disputed facts in favor of the trier of fact's findings if a reasonable fact finder could have so resolved them. *Id.* We must disregard all evidence that a reasonable fact finder could have disbelieved and consider undisputed evidence even if such evidence is contrary to the trier of fact's findings. *Id.* In other words, we consider evidence favorable to termination if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.*

In a factual sufficiency review, we still give due deference to the trier of fact's findings, avoiding substituting our judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction [in the truth of its finding], then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

When conducting a sufficiency review, we may not weigh a witness's credibility — as it depends on appearance and demeanor; these are within the domain of the trier of fact. *J.P.B.*, 180 S.W.3d at 573. Even if evidence regarding appearance and demeanor are found in the appellate record, we must nevertheless defer to the fact finder's reasonable resolutions. *Id*.

*Section 161.001(b)(1) — Grounds for Termination*

At trial, the jury was instructed it could terminate Mother's parental rights if it found by clear and convincing evidence that: (1) Mother violated subsections (D), (E), or (O) of section 161.001(b)(1), and (2) termination would be in A.A.T.'s best interest. Mother challenges the sufficiency of the evidence as each to of the statutory grounds upon which the jury was charged. However, only one statutory ground is necessary to support a judgment in a parental-rights termination case. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.W.*, 494 S.W.3d 287, 291–92 (Tex. App.—Texarkana 2015, no pet.). Accordingly, when, as here, multiple statutory grounds for termination are alleged and the trial court issues a broad-form question asking the jury whether the parent-child relationship should be terminated, we must uphold the jury's finding if any of the statutory grounds alleged supports it. *See Spurck v. Tex. Dept. of Family & Protective Servs.*, 396 S.W.3d 205, 221 (Tex. App.—Austin 2013, no pet.) (citing *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied)). In other words, if multiple predicate grounds are found by the trier of fact, an appellate court may affirm based on any one ground because only

one ground is necessary for termination. *E.W.*, 494 S.W.3d at 292. Thus, if we determine the evidence is sufficient to support any one of the three grounds for termination submitted to the jury, we need not address Mother's challenge to the remaining grounds. *See id.*

The jury was instructed that it could terminate Mother's parental rights if it determined termination would be in A.A.T.'s best interest and Mother violated one of three statutory grounds for termination, including that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of A.A.T. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Mother contends the evidence is legally and factually insufficient to support a finding that she failed to comply with section 161.001(b)(1)(O). We disagree.

The order Mother was required to comply with was the court-ordered service plan, which set out the tasks and goals Mother need to complete and attain in order to regain custody of A.A.T. and avoid termination of her parental rights. The evidence shows Mother was presented with a copy of the service plan, which was explained to her in the presence of her attorney, and that she signed the plan on September 14, 2014. Under the plan, Mother was required to complete, among other things, the following tasks and attain the following goals:

(1) provide proof she is able to support herself and her children independently;

(2) continue working with HUD to obtain a residence of her own and provide proof of same on a monthly basis;

(3) submit to a psychological evaluation and follow recommendations, giving honest and open answers to questions;

(4) attend bi-monthly counseling sessions with Dr. Rachel Goodman Yates and as a result:

    (a) demonstrate how she will manage risk factors in her home,
    (b) verbalize her understanding of the impact of physical abuse on J.G., her older children, and A.A.T.,
    (c) acknowledge the seriousness of the injuries suffered by J.G.,
    (d) acknowledge the injuries suffered by J.G. were due to abuse, not medical problems or physical abnormalities, and

(e) have the ability to identify signs of child abuse and describe ways to identify potential abusers

(5) acknowledge and describe her responsibility to manage risk factors in the home and demonstrate that she understands she is ultimately responsible for her children's safety;

(6) acknowledge the potential for future abuse;

(7) be able to identify signs of abuse and describe appropriate interventions if needed;

(8) demonstrate empathy toward her children, especially J.G., for the physical abuse he suffered and demonstrate an understanding of the impact of physical abuse on her children;

(9) demonstrate an understanding of the importance of providing a safe home for her children; and

(10) demonstrate an understanding of the seriousness of the injuries sustained by J.G. while in her care and in the care of her family members.

Much of Mother's service plan was directed to understanding risk and recognizing and acknowledging the abuse suffered by J.G. As Department worker Melanie Torres testified, A.A.T. was taken from Mother almost immediately after his birth based on the Department's prior removal — and the trial court's ultimate termination — of Mother's four older children based on abuse suffered by J.G. According to Ms. Torres, although Mother completed some services, she failed to complete the mandated counseling with Dr. Yates, thereby failing to attain the goals set out in the service plan — particularly those relating to risk and abuse. Ms. Torres testified Mother discontinued counseling with Dr. Yates after the first termination trial at which her rights to her four older children were terminated. Mother voluntarily discontinued counseling; she was not discharged.

According to Ms. Torres, Mother continued to assert J.G. was injured accidentally and denied any knowledge of the source of his injuries, despite claims of abuse by her three older children and evidence from medical providers. She continued to deny J.G. was abused by family

members or R.T., establishing a failure to attain the several of the service-plan goals set forth above.

Similar testimony was provided by Dr. Yates. Dr. Yates also testified Mother stopped attending therapy in May 2015 without being discharged. Dr. Yates found it telling that Mother discontinued counseling after a visit with A.A.T. at which Mother appeared to have suffered injuries such that she was unable to pick up or carry A.A.T. on her own. Dr. Yates confronted Mother about her injuries, but Mother refused to speak about the incident, stating she needed to speak to her attorney. Evidence in the record showed the injuries occurred during a domestic violence incident with R.T. Although Mother testified she was the instigator in the situation and denied she suffered injuries at the hand of R.T., there was evidence to the contrary.

Dr. Yates testified that when Mother began therapy, she was encouraged by Mother's progress. However, progress ended when Dr. Yates began confronting Mother with regard to the abuse suffered by J.G. and the choices Mother made with regard to the men in her life — all of whom, the evidence established, had criminal backgrounds. According to the doctor, Mother began her "big pull away" after Dr. Yates confronted her about the domestic violence incident with R.T. Dr. Yates never saw Mother again after that. Although Dr. Yates attempted to call Mother on "many occasions," dropped by her place of employment, and sent messages to Mother through the Department caseworker, Mother never responded.

Dr. Yates stated the Department's main concern with regard to Mother — as reflected in the tasks and goals of the service plan — was her inability to assess risks to herself and her children by continually engaging in relationships with unsuitable men. Mother's inability to assess risks endangered her children, and Mother was defensive when confronted with these issues. According to Dr. Yates, Mother: (1) never demonstrated how she would manage risk factors in her home; (2) was unable to verbalize her understanding of the impact of physical abuse on J.G. and the other

children; (3) never acknowledged the seriousness of J.G.'s injuries and, in fact, was never even able to describe the injuries; (4) never admitted J.G.'s injuries were the result of abuse as opposed to medical issues or physical abnormalities; and (5) although she made some progress in her ability to describe ways to recognize potential abuse and identify the signs, she was still unable to understand "risk factors in general" or recognize unacceptable romantic partners. According to the doctor, Mother lacks the ability to assess risk, and as a result, the doctor believes Mother will end up in other relationships similar to those she entered before thereby endangering herself and her children. Dr. Yates testified that even though A.A.T. is not one of the original children that first prompted the necessity of removal and counseling, the child should not be returned to Mother because Mother is still unable to assess risk, exposing A.A.T. to the same sort of situations that resulted in J.G.'s injuries and ultimately, termination.

In sum, Dr. Yates opined that Mother is unable to see the risks created by her behavior and the potential behavior of other adults who have access to her children. According to Dr. Yates, R.T. was simply an example of Mother's inability to assess risk. The doctor stated Mother tends to overlook "tendencies and behaviors that would indicate to her" that certain people could be injurious to her children. Dr. Yates testified Mother was simply unable to see and assess risks to herself and her children.

Based on the evidence set out above, as well as other evidence in the record, we hold the jury, which is entitled to judge witness credibility, could have reasonably formed a firm belief or conviction that Mother failed to comply with the provisions of her service plan relating to risk recognition and assessment, as well as recognition and acknowledgement of the abuse suffered by J.G. *See A.B.*, 437 S.W.3d at 502; *J.P.B.*, 180 S.W.3d at 573.

Moreover, although Mother obtained a home of her own at one point, she ultimately moved back in with her mother — the home where J.G. was injured. Pursuant to the service plan, Mother

was required to obtain her own home.  It is undisputed that she ultimately failed to complete this service-plan task.  We recognize Mother testified she was unable to secure housing through HUD because she did not have custody of her children.  However, any excuses for failing to comply with a provision in a court-ordered service plan is only considered under a best interest analysis, not in an analysis relating to a parent's alleged failure to comply with the terms of the service plan. *In re L.C.*, Nos.13-13-00437-CV & 13-13-00438-CV, 2013 WL 6730181, at *6 (Tex. App.—Corpus Christi Dec. 19, 2013, no pet.) (mem. op.) (citing *In re M.C.G.*, 329 S.W.3d 674 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (supp. op.); *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied) (observing that "the statute itself does not make a provision for excuses"), *overruled in part on other grounds, In re A.M.*, 385 S.W.3d 74, 78 (Tex. App.—Waco 2012, pet. denied)).  "The Family Code does not provide for substantial compliance with family services plan." *L.C.*, 2013 WL 6730181, at *6 (quoting *M.C.G.*, 329 S.W.3d at 676).  Accordingly, we hold the jury could have reasonably formed a firm belief or conviction that Mother failed to comply with the provisions of her service plan that required her to obtain housing. *See A.B.*, 437 S.W.3d at 502; *J.P.B.*, 180 S.W.3d at 573.

Having determined there was sufficient evidence — legally and factually — for the jury to conclude Mother failed to comply with certain requirements of her service plan pursuant to section 161.001(b)(1)(O), we need not address Mother's sufficiency challenges to grounds (D) or (E). *See E.W.*, 494 S.W.3d at 292.  We now turn to Mother's sufficiency challenges to the jury's best interest determination.

*Section 161.001(b)(2) — Best Interest*

This court recognizes, as we have time and again, there is a strong presumption that maintaining the parent-child relationship is in a child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).  However, that presumption disappears when evidence to the

contrary is presented. *In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.). Moreover, there is a competing presumption which provides that permanently placing a child in a safe environment in a timely manner is also in a child's best interest. *B.R.*, 456 S.W.3d at 615; *see* TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016). In *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), the Texas Supreme Court set forth factors a trier of fact could consider when making a best interest determination:

(1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future;
(4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best interest of the child;
(6) the plans for the child by these individuals or by the agency seeking custody;
(7) the stability of the home or proposed placement;
(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent.

*Id.* Here, the jury was charged that in determining whether termination would be in A.A.T.'s best interest, it could consider the *Holley* factors. In addition, the jury was instructed, without objection, that it could consider: (1) the children's age[s] and physical and mental vulnerabilities; (2) the magnitude, frequency and circumstances of harm to the child; (3) whether the children ha[d] been the victim of repeated harm after the initial report and intervention by the department or other agency; (4) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the children's home; and (5) whether the child's family demonstrates adequate parenting skills, including providing the children under the family's care with protection from repeated exposure to violence even though the violence may not be directed at the child. *See* TEX. FAM. CODE ANN. § 263.307(b)(1), (3), (4), (7), (12). The trial court then instructed the jury that neither the *Holley* factors nor those from section 263.307(b) were exclusive, advising the jury it could consider "other factors in determining the best interest of" A.A.T. Moreover, the jury was

not required to find evidence of each and every factor before finding termination would be in A.A.T.'s best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). As the supreme court stated in *C.H.*, "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In addition, based on the "other factors" instruction, we find the trial court was advising jurors they could consider, among other things: (1) the acts or omissions as found under section 161.001(b)(1); (2) circumstantial evidence; (3) subjective factors; (4) and the totality of the evidence. *See In re R.S.D.*, 446 S.W.3d 816, 820 (Tex. App.—San Antonio 2014, no pet.).

The jurors were also provided with definitions of "endanger," and "abuse or neglect of the child." Jurors were advised "endanger" meant to expose to loss or injury, to jeopardize, and that it was not necessary that a parent's conduct be directed at A.A.T. or that A.A.T. actually suffered an injury. *See In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). "If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct." *In re C.J.F.*, 134 S.W.3d 343, 351 (Tex. App.—Amarillo 2003, pet. denied). Pursuant to the trial court's definition, the jury could find A.A.T. was endangered if it found abusive, violent, aggressive, or detrimental behavior by a parent that endangered the physical or emotional well-being of another parent or another child. "[D]omestic violence, want of self-control and propensity for violence may be considered as evidence of endangerment." *Id.* Endangerment was further defined to include acts and omissions that occurred before or after A.A.T.'s birth. *C.J.F.*, 134 S.W.3d at 351. Thus, the jury was entitled to consider whether Mother's actions, with respect to her four older children, constituted endangerment or abuse and neglect as to A.A.T. for purposes of termination.

*See In re K.N.D.*, 424 S.W.3d 8, 10 (Tex. 2014) (holding that parent's history with other children is relevant to determination of whether child removed for "abuse of neglect").

### 1. *Desires of the Child*

The evidence shows that at the time of trial, A.A.T. was not yet two years old. Thus, he was unable to express his desire regarding conservatorship. *See* TEX. FAM. CODE ANN. § 263.307(b)(1) (child's age and physical and mental vulnerabilities); *Holley*, 544 S.W.2d at 371–72. However, the Department presented, and the jury was entitled to consider, evidence regarding A.A.T.'s current placement and the time spent with Mother in evaluating his desires. *See In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 108 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The evidence established A.A.T. was removed from Mother and R.T. two days after his birth. Since that time, he has been with his current foster family. According to Ms. Torres, she has seen A.A.T. many times with his foster parents. She advised he is doing "great" in the foster home and is "bonded to the caregivers, the family." Ms. Torres testified A.A.T. is part of all family functions, is a "happy kid," and in "very good health." In fact, he blended in with the foster family from the start and calls his foster parents "mama and dada." Ms. Torres said the foster parents love A.A.T. The foster father is a disabled veteran who stays home with A.A.T. and two other children whom the family has adopted.

Department caseworker Megan Martinez also testified about A.A.T.'s relationship with his foster family, stating he has a strong bond with his foster parents and foster siblings. She described the foster home as "safe," "loving," and "secure." According to Ms. Martinez, the foster parents meet all of A.A.T.'s physical and emotional needs and "would love to adopt" him. Moreover, the

foster mother is related to the current caregivers of A.A.T.'s four half-siblings, and they have already conducted visits between the siblings and intend to continue this practice.

Ms. Martinez testified that although Mother initially visited A.A.T. regularly, she stopped visitation in January 2016, and thus at the time of trial, had not seen A.A.T. for several months. Ms. Martinez stated it was Mother's responsibility to call and set up visits. Admittedly, Mother had to travel some distance for visitation, but Ms. Martinez testified she offered Mother gas cards and rides if necessary.

More specific testimony about Mother's visitation with A.A.T. was presented through assistant caseworker Melody Salazar. Ms. Salazar testified she is responsible for setting up visitation, transporting children for visitation, and monitoring visitation. She was responsible for visitation between Mother and A.A.T. Mother was permitted three visits per month. Ms. Salazar stated that in this case, visits are set up and she then calls or texts Mother to confirm. The parties meet at the Department office in Uvalde, with Ms. Salazar picking up A.A.T. and transporting him to the office.

Ms. Salazar testified that since September 2015, Mother has had approximately six visits with A.A.T. She stated that in the months before trial, there were "[p]robably eight, ten maybe" visits where Mother confirmed, but failed to show up. Ms. Salazar advised that in January, February, and March of 2016 — the three months preceding trial, there were no visits between Mother and A.A.T. Ms. Salazar stated that although she contacted Mother, she received no response. In November and December there were only two visits each month. She testified that even when Mother showed up for visitation, she was frequently late. Ms. Salazar opined that travel and money should not have been a bar to visitation because the Department offered Mother money to pay for visits, and in fact on one occasion, when Mother asked, the Department provided her with a gas card. On a separate occasion, when Mother advised she lacked funds to travel to Uvalde,

Ms. Salazar advised that the Department would provide Mother with money for travel expenses. Mother agreed, but then never showed up. Ms. Salazar concluded that since January 2016, Mother has expressed no interest in seeing A.A.T.

Ms. Salazar testified that when she observed visits between Mother and child, she saw no bonding. She stated Mother "doesn't hug him and love on him and stuff." According to Ms. Salazar, Mother shows no affection toward A.A.T., sometimes sleeping during visits.

Although Mother attempted to show it was the Department's fault that visitation fell off, Ms. Salazar denied it, stating she attempted to contact Mother to set up visits, but Mother was unresponsive. Although she admitted she did not try to contact Mother through her attorney, she advised that it was Mother's responsibility to contact her with regard to visitation.

2. *Emotional & Physical Needs/Emotional & Physical Danger*

A.A.T. was less than two years old at the time of trial — approximately twenty months old. Thus, he is very young and will require constant emotional and physical support for many years. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72; *In re J.G.M.*, No. 04-15-00423-CV, 2015 WL 6163204, at *3 (Tex. App.—San Antonio Oct. 21, 2015, no pet.) (mem op.). His age renders him vulnerable if he is left in the custody of a parent who is unable or unwilling to protect him. *See* TEX. FAM. CODE ANN. § 263.307(b)(1); *Holley*, 544 S.W.2d at 371–72; *J.G.M.*, 2015 WL 6163204, at *3. As Dr. Yates testified, Mother was never able to demonstrate her ability to recognize risk or acknowledge the injuries to J.G. were the result of abuse. These failures portend risk to A.A.T. if he is returned.

Mother's inability or unwillingness to protect her children, including A.A.T. — thereby placing them in physical or emotional danger — was demonstrated by the repeated abuse suffered by J.G. — abuse that Mother, even at the second termination trial and after hearing from various medical professionals, refused to accept or acknowledge. *See* TEX. FAM. CODE ANN.

- 31 -

§ 263.307(b)(3) (magnitude, frequency, and circumstances of harm to child); *id.* § 263.307(b)(4) (whether child has been victim of repeated harm after initial report and intervention by Department); *id.* § 263.307(b)(12) (whether child's family demonstrates adequate parenting skills); *Holley*, 544 S.W.2d at 371–72. The Department presented evidence that J.G. suffered repeated abuse from November 19, 2013, through the end of December 2013. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. According to the evidence, someone slapped J.G. repeatedly across the face — at least twice. And, J.G. suffered five fractures over the course of less than a month — fractures medical experts testified were the result of abuse. Nevertheless, Mother, even at trial, refused to acknowledge J.G.'s injuries were the result of abuse. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Mother continued to claim J.G. was not slapped, but fell off a bed. As for the fractures, despite medical evidence to the contrary — and testimony from her three older children, Mother continues to insist J.G.'s injuries were accidental — dropped by an older sibling or injured when pulled from a slatted-crib at daycare — or the result of an organic or medical condition. Mother testified she has not been shown that J.G. was abused, claiming she has never been shown a shred of evidence that he was abused. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Mother specifically stated her continued belief that J.G. was neither intentionally injured nor abused. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. When asked whether she thought a seven-month-old (J.G.'s age at the time of the fractures) could break all those bones by himself, Mother stated: "I couldn't tell you. I'm not a doctor." Yet she refused to accept the medical evidence showing that, in fact, the fractures could have only been the result of abuse by someone with access to her children — access she admits was limited to her family and R.T. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

There was also evidence of endangerment of Mother's three older children. The children made statements that Mother's paramour, R.T., who is A.A.T.'s father, hit them with a belt. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. They advised their caregiver, L.R., who was the paternal grandmother of the two older girls, that if they asked for food, cried, or did not want to get up in the morning, R.T. would hit them or they would be spanked. Despite this, Mother instructed her older children to refer to R.T. as "dad." Mother denied any of this ever happened. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

The evidence also showed that Mother's choices with regard to her relationships with men presented danger to her children. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. All four fathers of Mother's five children have served time in prison or jail. They also were known to use drugs. Moreover, there was evidence of domestic violence between Mother and R.T. *See A.I.G.*, 135 S.W.3d at 692 (holding that domestic violence may be considered as evidence of endangerment). If we accept Mother's own testimony, she herself committed domestic violence against R.T. as a result of jealousy — despite claiming she and R.T. were not in a relationship. *Id.* Mother's relationship choices are further evidence supporting Dr. Yates's opinion that Mother never met the goal of recognizing risk to herself and her children. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

Mother's prior and continuing choices portend future instability, thereby endangering A.A.T. *See B.R.*, 456 S.W.3d at 616. Her past conduct suggests similar conduct would recur, i.e., that she would be unable to recognize risk, thereby subjecting any child in her care to potential danger, including abuse. *See B.R.*, 456 S.W.3d at 616. Mother's refusal to accept the evidence regarding abuse creates physical and emotional danger for A.A.T. should he be reunited with Mother.

### 3. *Parenting Abilities/Available Programs*

The evidence of Mother's continued refusal to recognize and acknowledge the repeated abuse suffered by J.G., as well as that suffered by her three older children, is also relevant to Mother's inability to properly parent. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. So too, is her refusal to complete therapy with Dr. Yates, resulting in Mother's failure to attain those goals set out in her service plan — specifically recognition of risk and acknowledgement of abuse. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Mother, as detailed above, has chosen to disbelieve medical evidence of abuse or the claims of abuse by her own children.

As stated above, the Department created a service plan tailored for Mother's needs — specifically based, in part, on the abuse of J.G. — and the trial court adopted the plan as a requirement for reunification. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Yet Mother, by her own admission, chose to discontinue therapy when her therapist began to challenge her refusal to acknowledge the abuse and inability to recognize risk. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. The service plan mandated that Mother complete therapy with Dr. Yates and achieve the goals of therapy — particularly recognition of risk and acknowledgement and acceptance that J.G. was abused. However, Mother voluntarily withdrew from therapy, despite Dr. Yates's best efforts to re-engage her. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

### 4. *Plans for Child by Those Seeking Custody/Stability of Home or Proposed Placement*

Mother's lack of stability is demonstrated by the evidence of set forth above regarding her continued refusal to accept her children were abused and her complete inability to assess or recognize risk. *See* TEX. FAM. CODE ANN. § 263.307(b)(3); *id.* § 263.307(b)(4); *id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72.

In addition, Mother has been unable to procure her own housing, returning to her mother's home, the very home in which J.G. and the older children were abused. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. The evidence suggests the injuries to J.G.'s face were caused by his maternal grandmother, yet Mother chose to return to this home while testifying she could provide a separate, proper home for A.A.T. Moreover, Mother's inability to recognize the risk her relationships create for her children — due in part to her failure to complete therapy — suggests continued instability even if Mother were able to obtain a home of her own. *See* TEX. FAM. CODE ANN. § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Mother's relationships were admittedly with men with criminal backgrounds and drug problems — though she denied knowing this in some instances. This is yet another indication of instability of any potential home she might obtain.

A.A.T. is in a home with loving foster parents and foster siblings. *See Holley*, 544 S.W.2d at 371–72. The foster parents desire to adopt A.A.T. and have demonstrated an intent to allow him to continue to develop a relationship with his half-siblings, who already love him. A.A.T. is doing well in the home, thriving in fact, and he considers his foster parents his "mama and dada." He has been with them his entire life, but for two days. All the testimony established this home is loving and stable, providing A.A.T. with every physical and emotional need. *See id.*

5. *Acts or Omissions Indicating Parent-Child Relationship Not Proper/Excuses*

The evidence of acts or omissions by Mother that indicate she had an improper relationship with her children are those set forth above in our discussion of Mother's acts that physically and emotionally endangered them, particularly Mother's refusal to acknowledge or accept the abuse suffered by all four children, but particularly J.G. *See Holley*, 544 S.W.2d at 371–72. Mother presented a myriad of excuses for her acts and omissions. *See id.* The excuses consisted of, with regard to the abuse, her contention that she was never presented with "a shred" of evidence that

J.G. was abused.  In support, she presented evidence from private investigator Frederick Knoll Jr. — a former and subsequent Del Rio police officer — who opined it was highly possible J.G.'s facial injuries were the result of a fall.  He also opined that at least the left leg fractures were caused when an older child dropped J.G.  As to the other fractures, Officer Knoll testified he did not believe they were the result of abuse due to an absence of bruising, swelling, and redness.  He dismissed the abuse allegations provided by Mother's three older children in forensic interviews and to L.R., stating the children "seemed a little confused," but not expanding on this claim.  However, Officer Knoll admitted he was never told that Dr. Sanchez believed J.G.'s facial bruising was the result of multiple slaps, stating he wished he had been told.  Although he was aware Dr. Lukefahr believed the fractures were the result of abuse, he was never advised that a full skeletal survey of J.G. was ordered and completed in early December 13, 2013, and that it was clear.  He also admitted R.T. had access to J.G. at the times his injuries must have occurred.  Officer Knoll also admitted the only person he interviewed who was in the home at the time of the alleged abuse was Mother.  Despite this, the officer continued to opine there was no abuse.

Mother also had excuses for her failure to obtain a home, blaming HUD for refusing to provide her with a suitable home until her children were returned.  She also excused her failure to complete therapy, testifying she stopped therapy because she was tired of being asked to admit the existence of abuse or blame that abuse on R.T. when she did not believe there was any abuse, much less that either R.T. or her mother were responsible for it.  She also attempted to excuse the failure to visit A.A.T. during the months preceding trial, blaming the Department for failing to schedule visits or provide her with resources to attend.

*Summation — Grounds & Best Interests*

Based on the evidence, the jury could have determined Mother failed to complete her service plan by failing to complete therapy, reach goals set out in the plan, or obtain proper

housing. She failed to demonstrate an ability to recognize risk or acknowledge and accept that abuse was perpetrated on J.G. and her older children. The jury could have also determined Mother exposed her children to risk, and ultimately actual abuse, endangering their physical and emotional well-being. Mother engaged in, or was the victim of, domestic violence, which would also create danger for her children. Mother's actions since November 19, 2013, suggest continued dysfunction and instability. *See B.R.*, 456 S.W.3d at 616; *M.R.*, 243 S.W.3d at 821 (holding evidence of parent's unstable lifestyle can support fact finder's conclusion that termination is in child's best interest).

Therefore, based on the foregoing, we hold the evidence produced — as to the relevant *Holley* factors, as well as those set out in the applicable portions of section 263.307(b) of the Code — was such that the jury could have determined termination was in the best interest of A.A.T. *See* TEX. FAM. CODE ANN. § 263.307(b); *Holley*, 544 S.W.2d at 371–72. In other words, the evidence is such that jurors could have reasonably formed a firm belief or conviction that termination was in A.A.T.'s best interest. *See J.P.B.,* 180 S.W.3d at 573.

## CONCLUSION

We hold the trial court did not abuse its discretion in excluding the proffered testimony from Mother's expert, Dr. Miller, with regard to his ideas relating to metabolic bone disease or TBBD. We therefore overrule Mother's first issue. We further hold the evidence is legally and factually sufficient to have permitted the jury to find Mother violated section 161.001(b)(1)(O) of the Code by failing to comply with the requirements of her court-ordered service plan and that under section 161.001(b)(2) of the Code, termination was in A.A.T.'s best interest. Thus, we overrule Mother's second and third issues. In sum, we affirm the trial court's termination order.

Marialyn Barnard, Justice